Pek CttRiam :
This is a suit for the taking of an easement of flight over plaintiffs’ property in the vicinity of the Perrin Air Force Base, near Sherman, Texas. It is admitted that ¿here has been a taking and the only dispute is over the diminution in value of the property as a result thereof.
The property consists of the south 50 acres, more or less, of the southwest quarter of section 3, subdivision of University Leagues 1, 11, 15 and 16 in Grayson County, Texas, and is more fully described in the deed to plaintiffs. It is dated September 21, 1950, and is in evidence as plaintiffs’ exhibit 1.
There is but little difference between the parties on the amount of the diminution in value. The Trial Commissioner finds $18,000. Plaintiffs take no exception to this finding. Defendant does except and says the diminution did not exceed $14,700.
Defendant admits there is evidence to support the Trial Commissioner’s finding. On page 3 of its brief is says:
The Commissioner has found (Finding 18) that the diminution in value of the farm amounts to $18,000. There is evidence to support that conclusion but, we submit, the weight of the evidence supports, indeed we *273 think it requires, the finding of a smaller sum. In our view, the damages should be found to be $14,700.
Defendant says its evidence is more credible because it is based on the testimony of a professional appraiser, who made a scientific appraisal of the property; whereas plaintiffs’ witnesses were uncertain, vague and indefinite. However, the Trial Commissioner heard all the testimony; he saw the witnesses on the stand and observed their manner and demeanor, and he was persuaded that plaintiffs’ testimony was more nearly accurate than was defendant’s. Under our rules the Trial Commissioner’s finding is presumptively correct. [Rule 48] We have not been convinced that it was erroneous.
The Trial Commissioner found that the flight of jet planes over plaintiffs’ property made impossible the continuation of the operation of the poultry business previously carried on there and it was removed elsewhere, and that thereafter the property was valuable only for grazing, and that its value for this purpose was $2,000. He found that it had suffered a diminution in value of $18,000. These findings we adopt as the findings of the court.
The Merchants and Planters National Bank filed a motion to be made a party plaintiff in the case, which was allowed, but thereafter it filed no pleadings setting up its claim.
Defendant has taken and now has a perpetual easement of flight for aircraft of all types over any part of plaintiffs’ property at altitudes of 34 feet and above. The easement was taken as of February 15, 1953. Plaintiffs will execute a deed conveying to defendant such an easement. For the taking of the easement judgment is rendered in favor of plaintiffs, Lysle Wilson and wife, Olga Wilson, and against defendant in the sum of $18,000, plus a sum computed at 4 percent per annum from February 15, 1953, to date of payment, to compensate for delay in payment.
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument. of counsel, makes findings of fact as follows:
*274 1. The plaintiffs, Lysle Wilson and wife, Olga Wilson, are the owners of a tract of land situated in the immediate vicinity of Perrin Air Force Base in Grayson County, Texas. The land consists of the south 50 acres, more or less, of the Southwest quarter of Section 3, Subdivision of University Leagues 1, 11, 15 and 16 in Grayson County, Texas, and is more fully described in the deed to plaintiffs. It is dated September 21, 1950, and is in evidence as plaintiffs’ exhibit 1.
Merchants and Planters National Bank of Sherman, Texas, has been joined as a party plaintiff, because the bank claims outstanding vendor’s and deed of trust liens on the property, but no pleadings were filed by the bank.
2. Perrin Air Force Base, which is located 10 miles north of Sherman, Texas, was originally acquired by the United States from Grayson County, Texas, under deed dated January 23, 1950. On July 17, 1952, Perrin Air Force Base was designated as a permanent base by the Secretary of War under authority of 10 U.S.C. 9773. The base was used exclusively by propeller-driven aircraft until December 19, 1952, when the first jet-propelled aircraft were delivered. In February 1953, the first class of students began training in the flight of jet aircraft.
3. With the inception of jet aircraft operation at the base, it was necessary to construct new runways of greater length. The first of these, known as the east north-south runway, was built in 1952 and is located about 1,000 feet west of the original north-south triangular runways that were used by propeller-driven planes and now serve as taxiways. When projected, the center line of the easterly north-south jet runway is approximately 500 feet east of the eastern boundary line of plaintiffs’ land. As the volume of jet air traffic increased, a new westerly north-south jet runway was completed in December of 1953 and in January 1954, its use by jet aircraft was commenced. The center line of this runway is parallel to and 1,000 feet west of the center line of the easterly north-south runway and, if extended, the center line of the westerly runway would pass 500 feet west of the eastern boundary line of plaintiffs’ property and about 800 feet east of the improvements located thereon. The north *275 line of plaintiffs’ land is approximately 2,600 feet south of the south end of the westerly north-south runway.
4. The tract of land involved here was acquired by the plaintiffs for a consideration of $11,000. The former owner had operated a chicken farm on the property, and the Wil-sons acquired it for the purpose of providing a home for their family and for engaging in the business of producing eggs and chickens. At the time of acquisition, the farm contained a number of improvements, including a frame dwelling house of six rooms with a bath and a half. In addition, there was a large frame chickenhouse, measuring 44 feet by 68 feet, with a concrete foundation and concrete floors, and there were two smaller chickenhouses with concrete foundations. The source of water was a deep well on the property with pumping equipment and an overhead tank for storage. The farm was served by natural gas and electricity. A hard-surfaced road bordered the tract along its south and west lines. The Wilsons moved to the farm in 1950 and made substantial additions and improvements thereon. A concrete front porch, a glass-enclosed back porch, and extra plumbing and wiring were added to the dwelling house. One of the rooms was converted to a garage and an 85-foot television tower was installed. The old partitions in the poultry houses were replaced by new trusses for supporting large henroosts and roosts of new electric welded wire were installed. Concrete floors were poured in two of the chickenhouses and a new galvanized metal bam, 36 feet by 16 feet, was constructed. The dwelling house was repainted, brush was cleared from the pastureland, and a stock pond was dug. With the completion of these repairs and additions, the farm was well suited for the production of chickens and eggs.
5. From the period October 1950 until about the end of December 1952, the propeller-driven aircraft then operating at the base used runways which were located about 1,500 feet east of plaintiffs’ east property line. In addition to the factor of distance, the direction of takeoffs and landings was such that the propeller-driven planes at Perrin did not interfere with plaintiffs’ use of the farm nor with their chicken business.
*276 6. The jet aircraft which operated at Perrin Air Force Base during the years 1953 and 1954 were T33’s and F86-D’s through L’s. The volume of the noise and vibration generated by the operation of these planes is considerably greater than that caused by propeller-driven aircraft. The extent of the noise and vibration depends upon the altitude of the jet, the direction of the wind, whether the afterburner is engaged, and other factors. The F86’s are equipped with afterburners, the T33’s are not. Approximately 50 percent of the flights from Perrin are made in T33’s and in about 70 percent of the takeoffs by F86’s, the afterburner is used.
7. During the years 1953 and 1954, the normal schedule for the flying of jet aircraft at Perrin was between the hours of 8 a.m. and midnight, Monday through Friday. Operations were usually reduced on weekends. The easterly north-south runway, the only jet runway available until January 1954, is used for approximately 67 percent of the takeoffs and landings because the ground control approach equipment at the base can be used only on that runway and many of the flights are made for training in ground control approach. The easterly north-south runway also is used more than the westerly runway because it is nearer to the hangars and other installations than the westerly runway and, consequently, taxying distance and time are reduced by the use of the easterly runway.
8. During the period of jet operations at the base, the volume of traffic has been as great as 14,000 landings and takeoffs within a single month. The direction of takeoff and landing depends upon the direction and velocity of the wind, but the greater number of takeoffs and landings have been made in a southerly direction.
9. Each of the jet runways at the Perrin Air Force Base is 8,000 feet long. On a day when the temperature is 100 degrees and the density of the air is low, a T33 will be airborne by the time it has traveled 4,000 feet and will attain an altitude of from 50 feet to 75 feet above the runway by the time it reaches the end thereof. The plane climbs at the rate of 1,000 feet per minute and if operated according to instructions will attain an altitude of 300 feet above the terrain by the time it reaches the south boundary of plain *277 tiffs’ land. Normally, planes of both types follow the center lines of the runways and climb to an altitude of 2,500 feet before making any turn. Thus in 1953, when only the easterly runway was available, the flights which followed the center line of the runway passed to the east of plaintiffs’ land. However, there were occasions when student pilots failed to correct for wind draft or for other reasons did not fly in a straight line and flew directly over plaintiffs’ property. In January 1954, after the westerly north-south runway was put in use, the regular flight pattern for planes taking off from that runway toward the south was directly over the eastern portion of plaintiffs’ land.
10. In addition to the regular takeoffs and landings at Perrin in 1953 and 1954, student pilots were also trained in the “touch and go” operation, a term used to designate a practice landing in which the pilot merely touches the jet on the runway, immediately takes off, and then brings the plane around for another approach to the runway. The procedure is also used in cases where a pilot misjudges his approach to the extent that a landing brings the plane too near the end of the runway. In such situations, the ground control officer signals the pilot to take off immediately and to make another approach. The “touch and go” maneuver permits the jet to make a sharper turn after touching down than during a normal takeoff, because 60 percent of the engine power is held in reserve for a quick takeoff. As a result, some of the jets made turns north of plaintiffs’ residence and flew at lower altitudes over the farm and nearer to plaintiffs’ house and buildings than during normal takeoffs.
The “touch and go” maneuvers are part of the regular training at Perrin Air Force Base and occur with as much frequency as 40 times per day.
11. As a result of low and frequent flights of jet aircraft over their land during the period between February 1953 and August 1954, plaintiffs’ house became untenantable and the land was rendered unsuitable for the conduct of their poultry business. The noise and vibration from the jets made conversation difficult, prevented telephone conversations, and made it impossible for plaintiffs to sleep until *278 jet operations ceased at midnight. Family meals were interrupted by the rattling of windows and dishes on the table and shelves. Relatives ceased their visits because of their fear of jet aircraft flying overhead. The Wilsons lived in a state of tension which was heightened by several crashes in the vicinity of their farm. On one occasion, Mr. Wilson extricated a pilot from the wreckage of a jet which had crashed north of the property. On another occasion, Mr. and Mrs. Wilson threw themselves on the floor when they saw one of the planes approaching their residence at such a low altitude that it appeared certain to them that the plane would hit the house. The noise of the aircraft impaired Mrs. Wilson’s hearing and kept her in such a nervous state that she was placed under medical care.
12. The noise of the jets crossing plaintiffs’ land caused young chickens, which were placed in the pasture in accordance with approved poultry practices, to injure themselves by flying against trees or buildings. Others huddled on top of each other at any available shelter to the extent that they had to be removed to prevent their smothering. The hens which were housed and which needed to be kept quiet during the period of production were so frightened by the noise and vibration of the low flying planes that they flew out of the nests and either struck the walls or stacked up in the corners of the poultry houses. Some of the chickens were killed or injured, and the productiveness of the uninjured chickens decreased.
13. As previously stated, jet aircraft from the base began operating from the west north-south runway in January 1954. Its location was such that the jets began flying directly over plaintiffs’ land in their normal operation. Consequently, it was soon apparent to plaintiffs that they could no longer live in the residence nor conduct their chicken business on the property. In August 1954, the Wilsons moved their residence and chicken business to a different site east of Denison, Texas, about 15 miles from Perrin Air Force Base. The land was listed with a real estate agent for sale but no offers were received, and in view of their experience, plaintiffs despaired of finding any purchaser for the land or the buildings. They realized about $1,000 for the *279 improvements on the farm by the sale of some of the buildings and equipment and by the dismantling and removal of the remainder to their new home near Denison.
14. By an instrument dated April 17, 1951, the Wilsons leased the land to the Standard Oil Company of Texas for the production of oil, gas, and other minerals. At the time the lease was executed, the Wilsons received a bonus of $1,250, and at the present time they receive royalties from an oil well which is in production on the land.
15. After the Wilsons left the land, it was leased for the grazing of cattle during the years 1955-1958 at a rental of $200 per annum, but in 1958 the annual rental was reduced to $150.
16. In the action entitled The United States vs. 1687.25 acres of land, etc., No. 1054, in the United States District Court for the Eastern District of Texas, Sherman Division, filed on December 31, 1954, by declaration of taking filed the same day, the United States took the right to clear and keep clear the air space above the glide angle plane extending southerly from Perrin Air Force Base. At plaintiffs’ property, the glide angle plane slopes from an elevation of 34 feet above ground level at the northerly boundary of plaintiffs’ land to an elevation of 66.4 feet above ground level at the southerly boundary of plaintiffs’ land. Plaintiffs’ television antenna, which rose 85 feet above the ground level, extended above the glide angle plane, and it was necessary to dismantle and remove the antenna. No other structures on the plaintiffs’ land extended above the glide angle plane. With the declaration of taking, the United States deposited $350 for the benefit of the Wilsons, and they have withdrawn that amount from the registry of the court. At the time this suit was tried, that action had not been concluded.
17. On or about February 16, 1955, plaintiffs filed an answer and counterclaim to the complaint and declaration of taking in the United States District Court for the Eastern District of Texas. In their counterclaim, plaintiffs sought just compensation, in addition to compensation for the clearance easement covered by the declaration of taking, for the taking of their property by the flight of jet aircraft *280 over their land. Upon the filing of a motion by the Government to dismiss the counterclaim, the District Court held that the damages sustained by plaintiffs as a result of the flights of jet aircraft over their property were not a part of nor covered by the condemnation suit. Accordingly, the Government’s motion was granted without prejudice, however, to the right of plaintiffs to file an action in this court for the relief sought in their dismissed counterclaim.
18. Prior to the commencement of the operation of jet aircraft at the Perrin Air Force Base, the highest and best use of plaintiffs’ land was for a chicken farm, the purpose for which the Wilsons were using it. The flight of jet aircraft over the land leaves it useful only for the grazing of cattle and the production of oil. Before the flight of jet aircraft over the land, the land and improvements thereon had a fair market value of $21,000, exclusive of the value of oil or other minerals. Since the flight of jet aircraft over the property, the land has a market value of $2,000 as grazing land.
As previously stated, plaintiffs realized a salvage value of $1,000 from the sale or removal of buildings and materials. The diminution in value of the land and buildings as a result of the flight of jet aircraft over them is $18,000.
19. The United States has taken a perpetual easement over all of plaintiffs’ land for the flight of aircraft of all types at all times at elevations above 34 feet. The Wilsons did not decide that the land was no longer usable for residential purposes and as a chicken farm until shortly after January 1, 1954, when the westerly north-south runway was put in use for regularly scheduled flights of jet aircraft over the land. However, the evidence shows that the easement was taken on or about February 1, 1953, when jets began flying over plaintiffs’ land at low altitudes in the “touch and go” maneuvers.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs Lysle Wilson and wife, Olga Wilson, are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States the *281 sum of eighteen thousand dollars ($18,000), plus a sum computed at four (4) percent per annum from February 15,1953 to date of payment, to compensate for delay in payment, subject to the execution of the deed referred to in the opinion.