Laramore, Judge,
delivered the opinion of the court:
Pursuant to 28 U.S.C. §§ 1492 and 2509, the United States Senate, through Senate Resolution 344,[1] has asked us to pass upon the question of whether or not plaintiff is legally or equitably entitled to be additionally compensated for transportation services rendered by plaintiff for defendant during the period 1944 to 1946 at the Atomic Energy Commission installation at Oak Ridge, Tennessee.
At the outset it is pointed out that no legal liability would exist against the United States, for plaintiff’s cause of action would be barred by limitations under 28 U.S.C. § 2501. The petition was filed in this court on December 23, 1958; the resolution of the U.S. Senate which referred the matter to us (S. Res. 344, 85th Cong., 2d Sess.) was adopted on July 28, 1958; the bill for plaintiff’s relief (S. 2394) was introduced on June 26,1957. All these dates are considerably more than six years after the last date on which plaintiff’s claim could have accrued since the subject contracts were completed in 1946. Consequently, even if plaintiff had a legal claim within the jurisdiction of this court, such claim would be time barred by our 6-year statute of limitations.
*199 We turn now to the question of plaintiff’s equitable entitlement. There appear good reasons for lifting the bar of limitations in the instant case. Defendant’s administrative consideration of plaintiff’s claim did not end until 1955. The bill for plaintiff’s relief (S. 2394) was introduced just two years after this administrative determination of plaintiff’s claim. Under these circumstances, we believe that plaintiff’s delay in seeking a prompt judicial determination of his claim should be forgiven and we go on and consider the merits of plaintiff’s claim. See, S.N.T. Fratelli Gondrand v. United States, 166 Ct. Cl. 473, 484 (1964); Ralph Feffer and Sons v. United States, 166 Ct. Cl. 506, 508 (1964).
Commissioner Arens has rendered a most comprehensive, careful and detailed report in which he has concluded that the mileage rates which defendant “negotiated” with plaintiff were below the rates supported by defendant’s audits and formula for mileage rate determination, since defendant did not take into account the extra operating costs of plaintiff as compared to the costs of other operators. We have examined the record and agree with Commissioner Arens that the weight of the credible evidence compels such a conclusion.[2] We accept and adopt the findings of the Commissioner and make them the basis of our legal determination that plaintiff has an “equitable claim” within the meaning of 28 U.S.C. § 2509. It is our belief that under the facts of the instant case, as demonstrated below, the conscience and honor of the sovereign dictates that plaintiff be recompensed for the losses he has suffered. See, O'Donell v. United States, 166 Ct. Cl. 107, 118 (1964).
The operations involved in this action revolve around four contracts, their supplements and amendments, entered into between plaintiff and defendant’s agents.[3] Under the sub *200 contracts, plaintiff operated commuter bus service for employees at the Atomic Energy Commission installation at Oak Ridge, Tennessee. Prior to that time plaintiff operated a bus line on routes between Maryville and Lenoir City, Tennessee, and on routes between Lenoir City and different points in Oak Ridge. These bus line operations were profitable to plaintiff.
Plaintiff’s first two subcontracts (14 and 14-A) were with Roane-Anderson Company. Number 14 provided that plaintiff would operate buses to and from Oak Ridge by the use of rented government-owned buses at a designated rate per mile. Contract No. 14-A provided for the same services except with buses owned by plaintiff. On February 15,1945, American Industrial Transit succeeded Roane-Anderson as a government contractor to manage the bus transportation subcontracts. American Industrial Transit then negotiated two new subcontracts (8 and 8-A) which replaced but contained substantially the same provisions as subcontracts 14 and 14-A.[4]
*201 Plaintiff began operations under his subcontracts on February 14, 1944. Following a series of supplemental agreements in which the subcontracts were extended and mileage rates were “negotiated,” plaintiff’s subcontracts were terminated in May of 1946, but he was allowed to continue operations under the terms of the subcontracts until August 31, 1946. Thereafter, plaintiff continued to operate his franchise on runs to Oak Ridge for several months because contractual arrangements with defendant were then no longer required as a prerequisite to carrying passengers within the reservation. Due principally to reduced passenger requirements and the financial strain of the time payments on the buses which plaintiff was buying, he was unable to pay his bills. The mortgagors foreclosed the mortgages on his buses with the result that he was forced out of business.
The facts show that plaintiff’s net worth at the time he purchased his first bus in 1942 was between $20,000 and $30,000. When plaintiff entered into the subcontracts with defendant his net worth was about $40,000. At the conclusion of plaintiff’s subcontracts with defendant he was in debt between $40,000 and $50,000. It is stipulated by the parties that plaintiff suffered a net operating loss during the period of the subcontract operations of $18,818.76.
After plaintiff’s subcontracts were terminated, the Atomic Energy Commission arrived at a settlement -unilaterally. *202 The settlement took into account $7,879.95 asserted to be due the Federal government by reason of taxes due from plaintiff. On the unilateral settlement plaintiff was allowed a total of $5,745.02, which amount was sent to the Internal Revenue Service as payment on plaintiff’s account. This left due the Federal government from plaintiff the amount of $1,634.93.
Plaintiff contends that the losses he incurred -under the contract were due to defendant’s failure and refusal to negotiate and raise his mileage rate to conform to the provisions of the contracts. Defendant argues that plaintiff’s losses resulted from the inefficient manner in which he conducted his operations.
Except for the temporary rate for the first 6-month period, the subcontracts did not provide the rate to be paid per mile to the bus operators, nor did the subcontracts provide specific criteria to be used in arriving at the rate which was “negotiated” for each 6-month period of operation. The “formula” used by defendant in its negotiations with the operators for a mileage rate determination included: (1) operating cost per mile, (2) owner’s supervisory salary at a stated amount per mile, (3) return of six percent on invested capital, (4) efficiency in operation. Items (2), (3), and (4) were referred to by defendant’s agents as profit factors.
The initial mileage rate was determined among the operators chiefly on the basis of information available on their cost experience. The procedure established for revision of the mileage rate was for each operator to submit to defendant his cost of operation as shown by his books and records for the preceding 6-month period. Defendant then audited the books and records, disallowed items regarded as improper operating costs, and then “negotiated” a mileage rate on the above formula. The new mileage rate was applied retroactively to the first 6-month period and to the succeeding 6-month period, at the end of which period the audit-negotiation process was repeated. For all practical purposes the “negotiation” consisted of the agent of defendant “telling” the operator what items had been disallowed and *203 what the new mileage rate would be, although there was “discussion” of the disallowed items.
Thus, under the subcontracts the parties agreed that (1) the mileage rate was subject to “negotiation” and (2) that the rate to be determined was based on the cost experience of each subcontractor. Article VII, entitled “The Revision of Mileage Rate by Negotiation” of subcontract 14-A, provided that the cost of operation during the trial period, although not conclusive, would serve as a basis for the negotiated rate.
The facts in the case show that the formula used by defendant in arriving at the mileage rates was never explained to plaintiff, was never “negotiated”, but was dictated by defendant’s agents to plaintiff who was obliged to accept them or face the alternative of his equipment being idle because he could not operate his routes to Oak Ridge without a subcontract. In other words, although the contract contemplated that the rates were to be subject to negotiation, for all pracical purposes they were unilaterally determined by defendant’s agents.
Under the procedure established for revision of the mileage rate, the government audited the books and records of plaintiff in arriving at plaintiff’s cost of operation. The record discloses that the “negotiated” rate per mile allowed plaintiff was always less than plaintiff’s actual cost per mile. Plaintiff’s cost per mile was considerably higher than the average cost of other operators. The weight of the evidence supports the conclusion that the “negotiated” rate per mile allowed plaintiff was made by defendant after a comparison of plaintiff’s cost per mile with the cost per mile of other operators. This is clearly contrary to what was contemplated by the parties under the procedure established for revision of mileage rates requiring that the rate must be determined on the cost experience of each operator.
Plaintiff’s higher costs can be explained by the fact that his runs were on the whole shorter than the runs of the other operators with the result that his cost per mile was accordingly higher. It is apparent that this factor was not taken into consideration in determining the proper rate. Moreover, the record shows that plaintiff’s runs were over un *204 usually rough roads which caused extra maintenance; that he had unusual costs because of bridge and ferry tolls and schedules (fixed by defendant) which required extra layovers and dead-heading of buses; that when his mileage was reduced, the number of required buses was not reduced accordingly.
Therefore, it is the opinion of the court that the weight of the credible evidence compels the conclusion that the mileage rates which defendant “negotiated” with plaintiff for the first 6-month period were below the rates supported by defendant’s audits and defendant’s formula for a mileage rate determination, and did not take into account the extra operating costs of plaintiff as compared to the costs of other operators.
Consequently, the fair and reasonable mileage rates for plaintiff for the first 6-month period (February 14, 1944 through August 14, 1944) for his privately owned (P.O.) buses and government-owned (G.O.) buses operated by plaintiff are found to be as follows: P0 G 0

(Cents)

Audited cost- 27. 51 27.51'
Profit factor_ 2.32 1. 66
Management salary- .70 .70
Rates (cents per mile)_ 30.53 20.87
The fair and reasonable mileage rates for plaintiff for the second 6-month period are as follows: P0 Q 0

(Cents)

First period rates- 30.53 29.87
Less — Nonrecurring items- 1.76 1. 76
Rates_ 28. 77 28.11
The fair and reasonable rates for plaintiff for the third 6-month period are as follows:

p.o. G.O. (Cents)

Audited rates_ 23.63 23.63
Profit factor- 2.23 1.70
Rates_ 25.86 25.33
For the 6-month period from September 1, 1945 through February 28, 1946, the audit report reveals that plaintiff’s *205 maintenance costs were again excessive. This was attributed to the fact that at the beginning of the period plaintiff operated his terminal garage himself but then leased it to an individual who could not make proper repairs on the buses. Thereafter, plaintiff relet the garage to three individuals who charged, excessive prices for the repairs. The auditor for defendant did not analyze each of the hundreds of items which appear to be excessive maintenance costs, but made a notation that the matter could be adjusted at the negotiation with plaintiff. It is concluded that the maintenance costs of plaintiff for this period were excessive in the amount of $10,000, or 1.97 cents per mile. Sometime after the audit was made of the costs for this period, defendant made a redetermination and reduction in the mileage allowable by 24,841.4 miles, but failed to increase correspondingly plaintiff’s cost per mile, which was increased by 1.31 cents per mile by the reduction in mileage allowable. The fair and reasonable rates for plaintiff for the fourth 6-month period (September 1, 1945 through February 28, 1946) are found to be as follows:

p.o. G.O. (Cents)

Audited rate per new mileage_ 28.28 28.28
Recomputed profit factor_ 2.71 2.03
Kates_ 30.99 30.31
Less — Excessive maintenance_ 1.97 1.97
Fair and reasonable rates_ 29.02 28.34
The fair and reasonable rates for plaintiff for the fifth 6-month period (March 1, 1946 through August 31, 1946) are found to be the rates reflected by the actual cost of operation, plus the profit factor for the fourth 6-month period and are as follows:

P.O. G.O.

(Cents)

Audited rate_ 25.91 25.91
Profit factor_ 3.06 2.40
Bates_ 28.97 28.31
The following schedule contains the fair and reasonable rates for plaintiff, as found herein, and the translation of such rates into an amount due, less the amount paid:
*206 (1) Period from 2/14/44-8/14/^
P.O. 60,369.8 miles @ 30.530_$18,430.90
O.O. 241,319.1 miles @ 29. 870_ 72,082.02
Total amount due- 90,512.92
Total amount paid_ 77,896.27
Amount due plaintiff as found lierein-$12, 616.65
(2) Period from 8/15/44-2/14/45
P.O. 244,382 miles @ 28.770_ 70, 308. 70
O.O. 263,905 miles @ 28.110_ 74,183. 70
Total amount due- 144,492.40
Total amount paid- 132,083.92
Amount due plaintiff as found herein_ 12,408.48
(3) Period from 2/15/45-8/SI/45
P.O. 332,658.1 miles @ 25.860_ 86,025.38
O.O. 175,912.9 miles @ 25.330_ 44, 558. 74
Total amount due_ 130, 584.12
Total amount paid_122, 018.51
Amount due plaintiff as found herein_ 8, 565.61
(4) Period from 9/1/45-2/28/46
P.O. 229,788.2 miles @ 29.020_ 66,684.54
O.O. 52,733.0 miles @ 28.340_ 14,944.53
Total amount due_ 81, 629. 07
Total amount paid_ 72,238. 85
Amount due plaintiff as found herein_ 9,390.22
(5) Period from 3/1/46-8/81/46
P.O. 92.495.9 miles @ 28.970_$26, 806. 06
O.O. 20,388.8 miles @ 28.310_ 5, 772.07
Total amount due_ 32, 578.13
Total amount paid _ 31,464.99
Amount due plaintiff as found herein_ $1,113.14
Total due plaintiff at contract termination_ 44,094.10
Adjusted payment for mileage after contract termination-2, 891.50
Total due plaintiff_ $41, 202. 60
*207 CON'CLUSIOW
Since plaintiff was forced to take a lesser rate than that found to be fair and reasonable and less than that disclosed by defendant’s audits, and since his extra operating costs were not taken into account, and as a consequence thereof plaintiff suffered losses, we conclude that plaintiff is equitably due the sum of $41,202.60, less $1,684.93 still due for unpaid taxes owed by plaintiff, making the amount of plaintiff’s equitable entitlement the sum of $39,567.67.
This report, together with findings of fact incorporated herein, will be certified by the Clerk to the U.S. Senate pursuant to Senate Resolution 344.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard Arens, and the briefs and argument of counsel, makes findings of fact, as follows:
1. (a) On June 26,1957, there was introduced in the Senate of the United States and referred to the Committee on the Judiciary a bill, S. 2394, for the relief of R. M. Clark, an individual doing business as Lenoir City-Alcoa Bus Lines, the body of which bill reads as follows:
* * * That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to R. M. Clark (an individual formerly doing Business as Lenoir City-Alcoa Bus Lines), of Loudon County, Tennessee, the sum of $190,748.59. The payment of said sum shall be in full satisfaction of all claims of said R. M. Clark against the United States of America for additional compensation under subcontract numbered 14-14A, and extensions thereof and. supplements thereto, by and between the said R. M. dark and the Roane-Anderson Company, acting as an agent for the United States of America under contract numbered W-7401-Eng. 115, and its successor in operation, American Industrial Transit, Incorporated, a subsidiary corporation of Clinton Engineer Works. Said claim or claims arise from losses sustained as a result of the operation by the said R. M. Clark of motorbuses for the necessary transportation of nonresident employees of the Clinton *208 Engineer Works, Oak Ridge, Tennessee, to and from Lenoir City, Tennessee, and other points, as requested by said Clinton Engineer Works under contract calling for the revision upward or downward of the mileage rate to cover costs and to adequately and properly compensate the carrier for the services performed: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered m connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
(b) On July 24,1958, the Committee on the Judiciary of the United States Senate in Report No. 1935 reported favorably an original resolution, S. Res. 344, the body of which reads as follows:
Resolved, That the bill (S. 2394) entitled “A bill for the relief of R. M. Clark, an individual doing business as Lenoir City-Alcoa Bus Lines”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
(c) On July 28, 1958, S. Res. 344 was agreed to by the Senate of the United States.
2. (a) Plaintiff, R. M. Clark, a citizen and resident of Lenoir City, Loudon County, Tennessee, is an individual doing business as Lenoir City-Alcoa Bus Lines.
(b) Plaintiff’s claim arises out of subcontracts entered into between plaintiff and agents of the United States for the operation by plaintiff of buses between points in or about Lenoir City, Tennessee, and the Clinton Engineer Works reservation (subsequently the Atomic Energy Commission installation at Oak Ridge, Tennessee).
*209 3. (a) Plaintiff had only a fourth grade formal education, and prior to his entry into the contracts out of which his claim arises had little bookkeeping experience. For a period of several years prior to February 1944 plaintiff was employed in semi-skilled work by the American Aluminum Company at Alcoa, Tennessee, which is about 35 miles from plaintiff’s home in Lenoir City.
(b) In 1942 he acquired a bus which he used to transport himself and other American Aluminum Company employees who paid him fares for the trip between Lenoir City and Alcoa during each work day. He subsequently was issued a certificate of convenience and necessity by the Tennessee Railroad and Public Utilities Commission, and until December 28, 1944, he held a franchise from the Commission pursuant to which he operated, as a common carrier, about 10 buses on routes between Maryville and Lenoir City, Tennessee, and on routes between Lenoir City and different points in Oak Ridge. Plaintiff’s bus operations were profitable. In December 1944 the Commission, by reason of the subcontracts between plaintiff and defendant, changed plaintiff’s status on the Lenoir City-Oak Ridge routes to a contract carrier, and suspended his certificate of convenience and necessity during the period in which he operated as a contract carrier.
4. (a) On August 13, 1942, a Government reservation at Oak Ridge, in Roane and Anderson Counties, Tennessee, was established for an installation to develop the “Manhattan Project” for use of atomic energy as a weapon of war. The reservation was of approximately 58,752 acres and was about 20 miles long and averaged 7 miles wide. The installation, once known as the Clinton Engineer Works (C.E.W.), subsequently became known as the Atomic Energy Commission installation at Oak Ridge.
(b) During the construction of the atomic energy plants, the town of Oak Ridge, and the service facilities, many thousands of persons were employed on the reservation by the Government and its contractors. By 1944 there were approximately 75,000 persons residing on the reservation, and many thousands of persons who worked on the reservation commuted daily from their homes in east Tennessee.
*210 (c) Due to the then manpower shortage, security requirements that the reservation be sealed off to nonauthorized personnel, and limited housing facilities on the reservation, the Government contracted with Roane-Anderson Company to perform management services on behalf of the Government in providing transportation for workers living within a radius of 100 or so miles of the reservation.
5. (a) Roane-Anderson Company, on behalf of defendant, proceeded to enter into subcontracts with 19 separate individuals, partnerships, or corporations to provide the transportation. All of the subcontracts had the same basic provisions and apparently all of the subcontractors had at least some prior experience in bus operations. Except for the temporary rate for the first 6 months period, the subcontracts did not provide the rate to be paid per mile to the bus operators, nor did the subcontracts provide specific criteria to be used in arriving at the rate which was “negotiated” for each 6 months period of operation. The “formula” used by defendant in its negotiations with the operators for a mileage rate determination included:
(1) operating cost per mile,
(2) owner’s supervisory salary at a stated amount per mile,
(3) return of 6 percent on invested capital,
(4) efficiency in operation (cooperation, adherence to schedules, low accident rate, and similar factors).
Items (2), (3), and (4) were referred to by defendant’s agents as profit factors.
(b) The initial mileage rate varied among the operators chiefly on the basis of information available on their cost experience. The procedure established for revision of the mileage rate was for each operator to submit to defendant his cost of operation as shown by his books and records for the preceding 6 months period. Defendant then audited the books and records, disallowed items regarded as improper operating costs, and then “negotiated” a mileage rate on the-above formula. The new mileage rate was applied retroactively to the first 6 months period and to the succeeding-6 months period, at the end of which period the audit-negotiation process was repeated. For all practical pur *211 poses the “negotiation” consisted of the agent of defendant “telling” the operator what items had been disallowed and what the new mileage rate would be, although there was “discussion” of the disallowed items.
(c) The subcontracts provided for termination upon notice by either party.
6. (a) In the latter part of 1944 defendant’s agent notified plaintiff that, due to security and other considerations, he would not he permitted to continue his bus operations as a private carrier within the Oak Nidge reservation; and that if he wanted to continue these operations he must do so as a contract carrier. At that time plaintiff was operating five routes into Oak Nidge from Lenoir City and, including his Alcoa 'and Maryville routes, was running about 10 buses.
(b) On February 11, 1944, plaintiff entered into subcontract No. 1NA with Noane-Anderson Company, as agent for defendant, whereby he became obligated to furnish transportation services in his privately owned buses between Maryville and Lenoir City, Tennessee, and between Lenoir City and Oak Nidge, over the routes he had previously operated as a common carrier. Pertinent provisions of subcontract No. 14-A were as follows:
Aeticle III. Reports and Payments. The sale of all transportation privileges hereunder shall be made by or under the direction of the Company who shall provide printed tickets for regular daily riders, or such other classes as may be deemed necessary by the Company. The said tickets shall entitle the lawful holder thereof to such transportation upon the Subcontractor’s buses as shall be called for by said tickets and upon receipt by the operators of the Subcontractor’s buses shall be duly cancelled. It is agreed that the Subcontractor shall be paid 25 cents per mile for every bus mile traveled in providing service to the Neservation as required by the Company. On or before the 10th day of each month the Subcontractor shall submit to the Company a properly certified invoice or voucher covering the sums due it hereunder for services rendered during the preceding month. Such invoice shall be accompanied by a daily record of the mileage performed by each bus operated by the Subcontractor in performing service to the Neservation.
Article IY. Maintenance of Buses. The Subcontractor agrees to keep his buses repaired and maintained *212 in good operating condition in accordance with, the accepted standards of the motor bus industry.
Article V. Bight of Inspection. The Company, or its duly authorized representative, is empowered to make periodic inspections of the Subcontractor’s equipment, and operating practices in order to determine compliance with applicable provisions of Article I, IV, and VIII. *****
Article VII. The Revision of Mileage Rate Toy Negotiation.
(a) Agreement to revise mileage rate. Whereas the rate per mile to be paid the Subcontractor for performing the services under the terms of this Subcontract cannot be determined with sufficient certainty at this time and the rate per mile to be paid the Subcontractor as set forth in Article III may therefore be either too high or too low, therefore, it is mutually agreed by the parties that the rate per mile to be paid the Subcontractor under the terms of this Subcontract shall be revised upward or downward in accordance with this article on the basis of the actual experience of the Subcontractor in operating and maintaining the bus or buses for the first six (6) months period of this Subcontract (hereinafter called the “Trial Period”). It is further recognized by the parties hereto that the cost of operating and maintaining the bus or buses for the “Trial Period” will not prove absolute or conclusive, but will provide sufficient information and experience to permit a revision of the rate per mile to be paid the Subcontractor for performing the services under the terms of this Subcontract.
(b) The estimated, cost. The Subcontractor represents that the rate to be paid per mile as set forth in Article III was based upon the total estimated cost of the operation and maintenance of the bus or buses as required under the terms of this Subcontract, including but not limited to depreciation, maintenance, labor, insurance, administration and license and privilege taxes.
(c) Cost Statements.
1. Within ten (10) days after the completion of the “Trial Period” the Subcontractor will submit to the Company the following data:
(i) A statement showing operation and maintenance costs of the bus or buses operated during the “Trial Period” itemized in a manner satisfactory to the Company.
*213 (ii) The estimated cost of operation and maintenance of the bus or buses to be operated during the remainder of this Subcontract based upon the “Trial Period’^ previous operating experience of the Subcontractor, and upon all other relevant factors.
(c) On the same date, February 11,1944, plaintiff entered into subcontract No. 14 with Roane-Anderson Company, as agent for defendant, which subcontract provided for the rental of buses from the Government to plaintiff to be used in the transportation services provided by subcontract No. 14-A. Subcontract No. 14 also provided for use by plaintiff of Government-owned buses in plaintiff’s private bus operations which he still maintained between Alcoa and Lenoir City. The rental payment from plaintiff to the Government was specified to be 3 cents per mile on each of the Tented buses. Plaintiff was to be paid 25 cents per mile for each mile of operation of the rented buses under subcontract No. 14-A for the first 6 months, with the rate to be readjusted thereafter. The provisions of subcontract No. 14 on revision of the mileage rate to be paid plaintiff were substantially the same as the provisions in subcontract No. 14-A. Other pertinent provisions of subcontract No. 14 were as follows:
ARTICLE m — RECORDS
The Subcontractor shall maintain his books and records of account in a manner satisfactory to the Company so as to reflect accurately the cost of the operation and maintenance of the buses operated under this Subcontract, which shall disclose specifically the maintenance cost of each piece of Government owned equipment. The books and records of account of the Subcontractor shall be subject to examination and audit by the Company from time to time, but such audit and examination shall be performed in such a manner and at such time as not to interfere with the services being performed by the Subcontractor under this Subcontract.
(d) On February 14, 1944, plaintiff began operations under his subcontracts.
7. (a) On February 5,1945, a three-party agreement was entered into by American Industrial Transit Company, Roane-Anderson Company, and plaintiff, under which American Industrial Transit Company, as agent of defend *214 ant, was substituted for Noane-Anderson Company in subcontracts No. 14 and No. 14-A.
(b) On February 11,1945, plaintiff and American Industrial Transit Company, as agent for defendant, entered into new subcontracts designated subcontracts No. 8 and No. 8-A, which replaced but contained substantially the same provisions as subcontracts No. 14 and No. 14-A.
(c) Following a series of supplemental agreements in which the subcontracts were extended and mileage rates were negotiated, plaintiff’s subcontract was terminated in May 1946 but he was allowed to continue operations under the terms of the subcontract until August 31,1946. Thereafter, plaintiff continued to operate his franchise on runs to Oak Nidge for several months because contractual arrangements with defendant were then no longer required as a prerequisite to carrying passengers within the reservation. Due principally to reduced passenger requirements and the financial strain of the time payments on the buses which plaintiff was buying, he was unable to pay his bills. The mortgagors foreclosed the mortgages on his buses and he was forced out of business.
(d) At the trial plaintiff testified that the formula used by defendant in arriving at the mileage rates was never explained to him. He testified further:
Each time we went in for those negotiations they [defendant’s agents] already had the rates set up and they told us that is what it was and we never were able, no matter what we said or done, to raise that one fraction of a cent.
*****
* * * they told me that if I didn’t accept this figure they offered me they would give my operation to another operator * * * so rather than lose my operation and in order to get my money I signed at a figure I knew was less than it cost me to operate, and those kind of methods were used in there. What was supposed to be a contract renegotiation was nothing more than a dictated thing, they would tell us what they would give us and say take it or leave it, if you don’t want it we have other operators that will.
(e) The essence of plaintiff’s above testimony was corroborated by other operators who testified at the trial.
*215 (f) It is found from all the evidence that the mileage rates were not negotiated but were dictated by defendant’s agents to plaintiff, who was obliged to accept them or face the alternative of his equipment being idled because he could not operate his routes to the Oak Eidge reservation without a subcontract.
(g) At the time plaintiff purchased his first bus in 1942 his net worth was between $20,000 and $30,000. When plaintiff entered into the subcontracts with defendant in February 1944 his net worth was about $40,000. At the conclusion of plaintiff’s subcontracts with defendant he was in debt between $40,000 and $50,000. The parties have stipulated that during the period of plaintiff’s operations under the subcontracts, he received from his subcontracts revenue of $438,593.84 and suffered an operating loss of $18,818.76.
(h) After plaintiff’s subcontract was terminated, attempts at a final settlement between plaintiff and American Industrial Transit were unsuccessful. In 1950 American Industrial Transit was relieved of responsibility for making final settlement with all of the bus operators, including plaintiff, whose subcontracts had been terminated. The Atomic Energy Commission took over the function of final settlement.
(i) Plaintiff sought final settlement on the basis of the claimed amount of money lost, plus profits, but the parties did not agree. Eventually the Atomic Energy Commission arrived at a settlement unilaterally. Prior to the termination of plaintiff’s subcontract, the Atomic Energy Commission was served with notice of levies or warrants of distraint on plaintiff by the United States Internal Eevenue Service. The total amount of tax claimed due from plaintiff was $10,-059.74, made up as follows:
$5,388.27 — taxes withheld from employees but not remitted to the Government;
$1,698.03 — Federal Insurance Compensation Act payments not turned over to the Government;
$293.65 — Federal excise tax; and
$2,679.79 — due the Government and the State of Tennessee Department of Employment Security.
A total of $7,379.95 was asserted to be due the Federal Government. In the unilateral settlement plaintiff was allowed *216 $2,853.52 plus additional contract payments of $2,891.50, or a total of $5,745.02, which amount was sent to the Internal Revenue Service as payment on plaintiff’s account. This left due the Federal Government from plaintiff the amount of $1,634.93 as of February 28,1955. No counterclaim has been filed in the instant case for the above amount of $1,634.93, since defendant assumed that it was barred from collection by the statute of limitations. Defendant has asserted, however, that if plaintiff is found to be entitled to any allowance of his claim on the basis of equity and good conscience, then on the same basis defendant should be entitled to an offset of the $1,634.93.
8. Defendant’s audits of plaintiff’s books and records, which were received in evidence, reflect that the items disallowed by defendant in arriving at plaintiff’s actual cost of operation were principally as follows:
(a) all of the payments to plaintiff personally;
(b) items for which no supporting invoice was available;
(c) items chargeable to a period other than the period under audit;
(d) duplicate items;
(e) expenses of noncontract operations, including expenses of a terminal cafe, expenses of a terminal garage during a time when the garage was a corporation separate from plaintiff’s bus operations, and expenses of plaintiff’s noncontract run (from Lenoir City to Alcoa);
(f) excessive interest paid on loans;
(g) cost of gasoline sold to the public but charged to plaintiff’s bus operations; and
(h) mathematical errors.
Plaintiff offered no substantial evidence to rebut the validity of these disallowances made by defendant, and the disallowances are found to have been proper.
9. The following schedule, composed from the audits of plaintiff’s books and records, reflects (1) plaintiff’s actual costs of operation in terms of cents per mile after the dis-allowances and the addition of the profit factors, and (2) the negotiated rates. The schedule embraces both plaintiff’s privately owned (P.O.) buses and Government-owned (G.O.) buses operated by plaintiff.

*217

1 Not in evidence.
2 Not considered.
10. (a) At the trial there was received in evidence defendant’s Revised Mileage Rate Determination which reflects the disallowances and modifications made for the first 6 months period in arriving at the negotiated rate allowed plaintiff for the first two periods of his operations under the subcontracts. The negotiated rate per mile allowed plaintiff was always less than plaintiff’s actual cost per mile. The weight of the evidence supports the conclusion that the reduction in the “negotiated” rate allowed plaintiff was made by defendant after a comparison of plaintiff’s cost per mile with the cost per mile of other operators. This comparison showed that plaintiff’s cost per mile was considerably higher than the average.
(b) There was some conflict in the testimony as to the length of plaintiff’s runs, but the weight of the credible evidence supports the conclusion that plaintiff’s runs were on the whole shorter than the runs of the other operators and *218 that his costs per mile were accordingly higher. The following schedule shows the audited cost per mile and the average miles per bus operated of all bus operators for the first 6 months period (February 14,1944 through August 14, 1944):

i Negotiated rate was less than audited cost.
* Knoxville Transit, whose initial rate based on previous cost experience was 45 cents per mile, was negotiated to 40 cents per mile after audit. Payne-Richardson, whose initial rate of 25 cents per mile, was negotiated to 26.7 cents per mile for personally owned buses and 25.9 cents for G. .0. buses. Mr. Payne indicated in his testimony that this rate was less than his cost.
(c) The above schedule reveals that plaintiff’s runs were less than average in length, that in general the operators with the shorter runs had the higher per mileage costs, and that in general the operators with the higher per mileage costs were negotiated at a rate below their audited costs. The evidence does not support the conclusion that the extra cost per mile of a shorter run was taken into consideration in negotiating a rate.
(d) There was testimony that plaintiff’s runs were over unusually rough roads, which caused extra maintenance expense ; that he had unusual costs because of bridge and ferry tolls and schedules (fixed by defendant) which required extra *219 lay-overs and deadheading of buses; and that plaintiff’s per mileage cost was accordingly higher than that of other operators. The evidence establishes that plaintiff was a conscientious, hard-working operator who spent full time in his operation which was reasonably efficient.
(e) In May 1945, due to cancellation by defendant of part of one of plaintiff’s runs, his mileage was reduced by about one-third, without a reduction in the number of buses he was required to operate. Based on the testimony of experienced bus operators, it is reasonable to conclude that plaintiff’s cost per mile was increased as a result of the above cancellation.
11. The Revised Mileage Rate Determination (referred to in finding 10(a), supra) reveals that after the audit dis-allowances which have heretofore been found to be proper (finding 8, supra), defendant disallowed 3.51 cents per mile on plaintiff’s costs because of alleged excess depreciation, maintenance, and gasoline expense. No breakdown appears as to how much of the 3.51 cents per mile was due to any of the three items.
(a) The depreciation which plaintiff carried on his books was somewhat higher than the average of the other 18 operators. Plaintiff owned more buses than all but 2 of the other 18 operators and his depreciation would be expected to be substantially higher than the average. Neither the audit report nor any other evidence indicates any improper or excessive depreciation carried on plaintiff’s books.
(b) Plaintiff’s maintenance cost per mile was higher than that of the other operators. The audit report covering the first 6 months period reflects that plaintiff was required to purchase six engine replacements.
(c) Plaintiff’s gasoline mileage was reflected on his books as 7.92 miles per gallon. The average for other operators was 8.16 miles per gallon. Neither the audit report nor any other evidence indicates that plaintiff’s gasoline mileage, as reflected on his books, was erroneous.
(d) At the trial defendant’s contracting officer testified to certain alleged irregularities of plaintiff which were the basis of disallowance at the time of the negotiation of the mileage rates. These included charging as part of his expense at retail prices items obtained by plaintiff at wholesale prices *220 and including costs of plaintiff’s private bus operations in. tbe costs of plaintiff’s subcontract operations. It is found from all of the evidence, however, that disallowance for all actual irregularities of the nature alleged 'by defendant’s' contracting officer had been made at the time of the defendant’s audit, and hence no further disallowance was justified.
12. The computation reflected in the Revised Mileage Rate Determination (referred to in finding 10(a), supra) fails to include allowance for supervisory salary in accordance with defendant’s formula for a mileage rate determination, although defendant’s audits disallowed all of the payments to plaintiff personally. It was defendant’s intent to allow plaintiff $4,200 per annum for supervisory salary, or 0.70 cents per mile for the first two 6 months periods.
13. (a) The weight of the credible evidence compels the conclusion that the mileage rates which defendant negotiated with plaintiff for the first 6 months period were below the rates supported by defendant’s audits and defendant’s formula for a mileage rate determination, and did not take into account the extra operating costs of plaintiff as compared to the costs of other operators.
(b) The fair and reasonable mileage rates for plaintiff for the first 6 months period (February 14, 1944 through August 14, 1944) for his privately owned (P.O.) buses and Government-owned (G.O.) buses operated by plaintiff are found to be as follows:

Audited cost_ 27. 51 27. 51
Profit factor_ 2. 32 1. 66
Management salary_ .70 .70
Bates (cents per mile)_ 30.53 29.87
(c) Although the mileage rates for the first 6 months period were also to be applied to the second 6 months period (August 15, 1944 through February 14, 1945), plaintiff expended in the first 6 months period sums for nonrecurring items, such as the six engine replacements, which should not be considered in arriving at cost in obtaining fair and reasonable rates for plaintiff for the second 6 months period. It is assumed that half of the disallowed negotiated items of *221 3.51 cents per mile (see finding 11, supra) relates to nonrecurring items of expense and should be deducted from the rates for the second 6 months period. The fair and reasonable mileage rates for plaintiff for the second 6 months period are accordingly found to be as follows:

p.o. G.O. (Cents)

First period rates- 30. 53 29.87
Less — Nonrecurring items_ 1. 76 1.76
Rates _ 28.77 28.11
(d) The fair and reasonable rates for plaintiff for the third 6 months period (February 15,1945 through August 31, 1945) are found to be the rates reflected by the actual cost of operation plus the profit factor for the second 6 months period as appearing in the schedule in finding 9, supra. They are as follows:

p.o. G.O. (Cents)

Audited rates- 23. 63 23.63
Profit factor_ 2.23 1. 70
Rates _ 25. 86 25.33
(e) For the 6 months period from September 1, 1945 through February 28, 1946, the audit report reveals that plaintiff’s maintenance costs were again excessive. This was attributed to the fact that at the beginning of the period plaintiff operated his terminal garage himself but then leased it to an individual who could not make proper repairs on the buses. Thereafter, plaintiff relet the garage to three individuals who charged excessive prices for the repairs. The auditor for defendant did not analyze each of the hundreds of items which appeared to be excessive maintenance cost but made a notation that the matter could be adjusted at the negotiation with plaintiff. It is concluded that the maintenance costs of plaintiff for this period were excessive in the amount of $10,000, or 1.97 cents per mile. Sometime after the audit was made of the costs for this period, defendant made a redetermination and reduction in the mileage allowable by 24,841.4 miles, but failed to increase correspondingly plaintiff’s cost per mile, which was increased by 1.31 cents per mile by the reduction in mileage allowable. The fair *222 and reasonable rates for plaintiff for the fourth 6 months period (September 1, 1945 through February 28, 1946) are found to be as follows:
P.O. Gf.O. (Cent a)
Audited, rate per new mileage_ 28.28 28.28
Recomputed profit factor- 2. 71 2. 03
Rates_ 30. 99 30. 31
Less — Excessive maintenance_ 1.97 1. 97
Fair and reasonable rates_ 29. 02 28.34
(f) The fair and reasonable rates for plaintiff for the fifth 6 months period (March 1, 1946 through August 31, 1946) are found to be the rates reflected by the actual cost of operation plus the profit factor for the fourth 6 months period as appearing in the schedule in finding 9, sufra. They are as follows:

P.O. G.O. (Cents)

Audited rate_ 25. 91 25. 91
Profit factor_ 3.06 2.40
Rates_ 28.97 28.31
14. (a) The below schedule contains the fair and reasonable rates for plaintiff as found herein and the translation of such rates into an amount due, less the amount paid:
(1) Period from. Z/U/U-8/H/H
P.O. 60,369.8 miles @ 30.53<¿_$18,430. 90
G.O. 241,319.1 miles @ 29.87$!_ 72, 082. 02
Total amount due_ 90, 512. 92
Total amount paid_ 77, 896.27
Amount due plaintiff as found herein_ $12, 616.65
(2) Period from 8/15/U-2/H/45
P.O. 244,382 miles @ 28.77ij;_ 70,308. 70
G.O. 263,905 miles @ 28.11$i_ 74,183. 70
Total amount due- 144,492.40
Total amount paid_ 132, 083. 92
Amount due plaintiff as found herein.
12,408.48

*223
(3)Period from, 2/15/45-8/31/45

P.O. 332,658.1 miles @ 25.86$!- 86, 025.38
G.O.175,912.9 miles @ 25.33$!_ 44, 558. 74
Total amount due- 130,584.12
Total amount paid_122,018.51
Amount due plaintiff as found herein- 8, 565. 61
(4) Period from 9/1/45-2/28/46
P.O. 229,788.2 miles @ 29.02$!_ 66, 684. 54
G.O. 52,733.0 miles @ 28.34$!- 14, 944.53
Total amount due_ 81, 629.07
Total amount paid_ 72,238.85
Amount due plaintiff as found herein- 9,390.22
(5) Period from 8/1/46-8/31/46
P.O. 92,495.9 miles @ 28.97$!_ 26, 806. 06
G.O. 20,388.8 miles @ 28.31$!- 5, 772.07
Total amount due_ 32,578.13
Total amount paid_ 31,464.99
Amount due plaintiff as found herein- 1,113.14
Total due plaintiff at contract termination- 44,094.10
Adjusted payment for mileage after contract termination. 2, 891. 50
Total due plaintiff_ $41,202. 60
(b) Since the court concludes that plaintiff is equitably entitled to the $41,202.60, in accordance with the above schedule, and that defendant is entitled to an offset of $1,634.93 for unpaid taxes owed by plaintiff, then the amount due plaintiff is accordingly reduced to $39,567.67.
15. Plaintiff asserted claims for overcharging on supplies purchased from defendant. Plaintiff has failed in his proof of such claims.
16. Plaintiff asserted claim for $50,000 as the value of his franchise which he lost when he was forced out of business. As heretofore indicated (finding 7(c)), after plaintiff’s subcontract was terminated and after he ceased operations under the subcontract, he continued operating for several *224 months under his franchise on routes to the Oak Nidge reservation, although on a drastically reduced scale. At the time plaintiff went out of business there was no market for his franchise. Plaintiff has failed in his proof of his claim for loss of his franchise.

 Since the case was referred, the petition filed, and the hearings held prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions in that case. Accordingly, the defendant's belated suggestion of lack of jurisdiction to entertain congressional references is rejected.

 Defendant lias filed a series of exceptions to the Commissioner’s report. They are primarily directed to the weight to be given the testimony of the various witnesses and the inferences to be drawn therefrom. Under our rules, the findings of fact made by the Commissioner shall be presumed to be correct (Rule 66, formerly Rule 48). We have considered defendant’s objections; however, we believe that in -the instant case, defendant has not overcome this presumption of correctness. See, Wilson v. United States, 151 Ct. Cl. 271 (1960).

 These contracts were designated as subcontracts because they were not between plaintiff and the government directly, but were entered into between plaintiff and agents of the United States who were carrying on a function in the nature of managerial services for the government.

 Articles III, IV, and VII of subcontract 14-A (which, are substantially the same as contained In all other contracts) provided:
Article III. Reporta and Payments. The sale of all transportation privileges hereunder shall be made by or under the direction of the Company who shall provide printed tickets for regular dally riders, or such other classes as may be deemed necessary by the Company. The said tickets shall entitle the lawful holder thereof to such transportation upon the Subcontractor’s buses as shall be called for by said tickets and upon receipt by the operators of the Subcontractor's buses shall be duly cancelled. It is agreed that the Subcontractor shall be paid 25 cents per mile for every bus mile traveled in providing service to. the Reservation as required by the Company. On or before the 10th day of each month the Subcontractor shall submit to the Company a properly certified invoice or voucher covering the sums due it hereunder for services rendered during the preceding month. Such invoice shall be accompanied by a daily record of the mileage performed by each bus operated by the Subcontractor in performing service to the Reservation.
Article IV. Maintenance of Buses. The Subcontractor agrees to keep his buses repaired and maintained in good operating condition in accordance with the accepted standards of the motor bus industry.
Article VII. The Revision of Mileage Rate t>y Negotiation.
(a) Agreement to revise mileage rate. Whereas the rate per mile to be paid the Subcontractor for performing the services under the terms of this Subcontract cannot be determined with sufficient certainty at this time and the rate per mile to be paid the Subcontractor as set forth in Article III may therefore be either too high or too low, therefore, It is mutually agreed by the parties that the rate per mile to be paid the Subcontractor under the terms of this Subcontract shall be revised upward or downward in accordance with this article on the basis of the actual experience of the Sub *201 contractor in operating- and maintaining the bus or buses for the first six (6) months period of this Subcontract (hereinafter called the “Trial Period”). It is further recognized by the parties hereto that the cost of operating and maintaining the bus or buses for the “Trial Period” will not prove absolute or conclusive, but -will provide sufficient information and experience to permit a revision of the rate per mile to be paid the Subcontractor for performing the services under the terms of this Subcontract.
(b) The estimated cost. The Subcontractor represents that the rate to be paid per mile as set forth in Article III was based upon the total estimated cost of the operation and maintenance of the bus or buses as required under the terms of this Subcontract, including but not limited to depreciation, maintenance, labor, insurance, administration and license and privilege taxes.
(c) Cost Statements.
1. Within ten (10) days after the completion of the “Trial Period” the Subcontractor will submit to the Company the following data:
(!) A statement showing operation and maintenance costs of the bus or buses operated during the “Trial Period” itemized in a manner satisfactory to the Company.
(ii) The estimated cost of operation and maintenance of the bus or buses to be operated during the remainder of this Subcontract based upon the “Trial Period”, previous operating experience of the Subcontractor, and upon all other relevant factors.