Davis, Judge,
concurring in the result:
The Trial Commissioner has found that, when plaintiff purchased the land in 1949, he intended to farm it. Under the standards we employ to review factual findings of this this type by our Commissioners (Wilson v. United States, 151 Ct. Cl. 271, 273 (1960); Davis v. United States, 164 Ct. Cl. 612, 617 (1964); Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 536-37, 338 F. 2d 81 (1964); Litchfield Mfg. Corp. v. United States, Ct. Cl. 167 Ct. Cl. 604, 612, 338 F. 2d 94 (1964), n. 13), I would not overturn this express finding.* However, it is clear to me from the record, including *506 among other tilings plaintiff’s own statements, that by the time of the transactions reflected in the income of the taxable years (1956-1958), he held the property primarily for sale to customers in the ordinary course of a real estate business. He was no longer engaged in farming, and to a substantial extent he was actively involved in the sale of the lots which was his primary occupation. He was not merely an investor passively accepting the proceeds of his capital.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. William J. Miller and Elizabeth P. Miller, husband and wife, are residents of Princess Anne Comity, Virginia.
2. This suit was instituted by plaintiff to recover individual Federal income taxes with respect to calendar years 1956, 1957, and 1958, totaling $5,301.55.[1]
3. Plaintiff filed timely income tax returns for each of the years 1956, 1957, and 1958. In each of those returns plaintiff reported gain from the sale of lots as long-term capital gain. The District Director of Internal Revenue, Richmond, Virginia, upon audit, determined that the gam from the sale of lots during the 3-year period involved in this action constituted ordinary income, and assessed deficiencies on those years as follows:

Year Deficiency Interest

1956___$1,134.72 $196.82
1957_ 978.24 110.98
1958_ 2,734. 62 146.17
Plaintiff paid the deficiencies and filed timely claims for refund. The claims for refund were disallowed by defendant and, thereafter, plaintiff brought this suit.
4.(1) The income tax return for the year 1956 shows plaintiff declared as income $9,895.14.[2] This includes $361.20 income from interest, $1,546.06 income from rents and royalties. His total gain on the sale of lots was *507 $17,526.20, but tinder the law plaintiff was required to report as income only 50 percent of his net gain, which was $7,987.98.
(2) Plaintiff’s income tax return for the year 1957 shows that he declared, as income, $8,525.85. This includes $2.80 income from farming, $435.89 income from interest, $493.44 income from rents and royalties, $600 income from loan exchange, $160 income from the sale or exchange of other than capital assets, and $6,834.22 income from the sale or exchange of capital assets, which is 50 percent of the gain derived from the sale of lots at a gross sales price of $19,650.
.(3) Plaintiff’s income tax return for the year 1958 shows plaintiff declared as income $12,411.03. This includes $915.79 income from farming, $179.35 income from interest, $329.72 income from rents and royalties, $100 from the sale of dairy barns sold as junk, and $10,886.17 income from the sale or exchange of capital assets, which is 50 percent of the gain derived from the sale of lots at a gross sales price of $30,200.
5. Plaintiff William J. Miller was bom March 12,1907, in London, Ohio. His father was a farmer, and plaintiff worked on his father’s farms until he was about 20 years old. For a period of about 2 years after leaving his father’s farm, plaintiff worked at nonfarm labor. Most of plaintiff’s adult life, prior to the purchase of the farm, had been spent earning a living working on farms or on jobs which are farm-oriented. By 1944, when plaintiff was 37 years old, he ceased doing any farming, except to provide food for his family’s consumption. From then on he engaged in several commercial enterprises, the coal business and the retail and wholesale buying and selling of poultry, the operation of a service station and a place for the storing of cars. In the taxable years in question, plaintiff was not engaged in any activity other than what was necessary in connection with his car storage garage and the collection of rental from some buildings which were on the land when he acquired it from his vendor. During this time plaintiff also was engaged in fixing the sales price of each lot in his subdivisions, the signing of the contract of sale, receiving the proceeds thereof, and executing deeds.
*508 6. Sometime in June 1949 plaintiff and Mr. Swartzen-truber entered into a parol contract for the sale of Mr. Swartzentruber’s 94-acre farm. The agreed price was $50,000.
At the time plaintiff agreed to purchase the farm from Swartzentruber in 1949, the parties agreed that Swartzen-truber would live in the dwelling house and operate the farm rent-free until he could relocate his family, and that Swartzentruber would not charge plaintiff any interest on his indebtedness for the farm as long he he lived there. In 1949 plaintiff apparently thought Swartzentruber would move off the farm in a short time so that he could take possession of the farm.
7. Plaintiff made his first payment on the farm on December 27, 1951, in the sum of $20,000. On that same day Swartzentruber executed the first of the deeds of the farm land transferring to plaintiff approximately 40 acres out of the total of 94 acres. The various deeds executed by Swartzentruber and the various payments made by plaintiff were as follows:
Date oí deed Number of acres Date of payment Amount
Dec. 27,1051». Dec. 27, 1951. $20,000.
Sept. 22,1962-
May 1, 1953_
Oct. 1, 1953_ Oct. 1953.. Gave[1] $10,000 note and $20,000 note.
1954.. Paid $10,000 note with interest.
1957.. Paid $20,000 note.
1958-Paid interest on $20,000 note.
Some time during the period that plaintiff was considering the purchase of this farm, he asked his neighbor, Hutchison, if he would like to go in with him in buying it, saying that they could make $100,000 on it “right quick,” but he did not explain just how he was going to make $100,000 on it, although Hutchison knew that he meant in some way other than farming it. Hutchison declined to go into the venture and in 1958 plaintiff told him he had “really missed the *509 boat.” He also told him that when he had sold two more lots, he would have the farm paid for, and then he was going to borrow $50,000 and make $200,000, but he did not explain how he was going to do it.
8. Shortly after the first 40 acres of the farm were deeded to plaintiff in December 1951 (following a payment of $20,-000) a real estate agent, W. E. Bratten, approached plaintiff with regard to selling parcels of the farm. At the time Bratten approached plaintiff, Swartzentruber was pressing plaintiff for payments on the farm.
•9. Mr. Bratten and plaintiff went to see a surveyor, C. A. Bamforth, and plaintiff hired Bamforth to plat 20 acres of plaintiff’s farm. On April 2, 1952, plaintiff entered into an exclusive sale contract with Bratten for the 20 acres (known as Section 1, Kempsville Heights). Until the time plaintiff breached this contract, Bratten sold only one lot.
10. On August 2, 1949, the area within a two-mile radius of plaintiff’s land began to be “opened up” as a suburban residential area. This activity increased after 1952. On February 28,1949, the city of Norfolk had adopted an ordinance to provide for extension of the city eastward by annexation of a large portion of Norfolk and Princess Anne Counties. Various suits were filed, and on January 1, 1955, the city was awarded 7,143 acres of Norfolk County; on January 1, 1959, the city was awarded 135 square miles of Princess Anne County. Because of the geographical situation of the city of Norfolk, the logical expansion of its city limits is east, towards plaintiff’s farm, and by 1959 the city limit was less than two miles from the land in question.
11. Because of the nature and location of plaintiff’s land, it was ideally suited for subdividing. On or about May 1, 1952, Kay Tyree, a realtor, approached plaintiff and informed him that certain builders wished to purchase lots. Plaintiff agreed to sell lots from the platted portion to builders procured by Tyree.[3]
12. After filing a plat on the 20 acres known as Section 1, Kempsville Heights, on March 20,1952, plaintiff filed a plat of approximately 20 acres on December 22, 1952, known as *510 Section 2, Kempsville Heights. On J anuary 22,1953, plaintiff filed a plat of approximately 36 acres known as Section 3, Kempsville Heights. All the land platted was acquired from Swartzentruber. Plaintiff contracted with excavators and road builders to make the minimum improvements to Section 1, as required by local ordinance. The work was begun in the spring of 1952 and completed in 1954, at a total cost of $8,815.56. The improvements of Sections 2 and 3 were begun in 1955. Section 2 was completed in 1958 at a cost of $13,681.88. The improvements made to Section 3 were completed in 1959 at a cost of $19,684.34 (the cost through 1958 being $8,772.67). The final plat, on Section 4, was filed November 16, 1959. The improvements through 1960 totaled $18,005.21.
13. On May 7, 1956, plaintiff granted G. E. Wetherington an exclusive option to purchase 63 lots, specified by section and lot number, at the rate of 20 lots per year for $1,800 per lot, provided that, if Wetherington failed to purchase 10 lots in any one year, the option terminated.[4]
14. All lots sold during the period involved hi this action were from Sections 1,2, and 3. In 1956, Wetherington purchased 15 of the 16 lots sold, the remaining lot being sold to Sylvester Smith, a state policeman who approached plaintiff without solicitation. In 1957, Wetherington purchased all 11 lots sold. In 1958, Wetherington purchased 10 lots, Peacock purchased three lots, and three lots were purchased by A. L. Taylor, Robert Webb, and Arthur Cardillo, who were personal friends of plaintiff.
15. Prior to May 1956, the sale of each lot was handled under a separate contract. Plaintiff assigned a sales price to each lot, signed the contract of sale, received the sale proceeds, and executed the deed at settlement.
16. The purchase price of the original farm was allocated among the four sections of Kempsville Heights by the plaintiff as follows:

*511

17. The taxpayer eventually subdivided all of the farm. The total number of lots of Kempsville Heights, all carved from the Swartzentruber 94-aere farm, was 182. The number of lots sold each year from 1952 through 1960 was as follows:
1952_ 8
1953_ 22
1954_ 5
1955_ 11
1956_ 16
1957_ 11
1958_ 16
1959_ 20
1960_ 26
135
18. During the period 1952 through 1955, plaintiff reported the gain on the sale of lots carved from the farm as ordinary income. On the 1952 return the gain was reported as gain from the sale of “property other than a capital asset.” On the 1953-55 returns it was reported as business income on Schedule C entitled “Profit (or Loss) from Business or Profession” and under item (I) on Schedule C, “principal business activity”, plaintiff wrote: “Buying property, breaking into lots for resale.” In the 1953-55 returns, plaintiff included a schedule entitled “Computation of Self-Employment Tax.” Under the item “State nature of business, if any, subject to self-employment tax,” plaintiff wrote in as follows:
1953 — Dressing & drawing poultry — Beal Estate dealer — Auto car Storage
1954 — Beal Estate developer; operating automobile car storage; service station; poultry mkt
*512 1955 — Eeal Estate Developer; operating aoto car storage ; Service Station.
19. Plaintiff’s tax returns have been prepared for him since 1941 by K,. L. Burchett, a free-lance bookkeeper, who prepares tax returns at nights and on weekends. In 1953 Burchett asked plaintiff how he described himself for the purpose of reporting the gain from sales of lots. Plaintiff did not understand the legal significance of that question and instructed Burchett to give his occupation as a dealer in real estate.
20. Mr. Burchett was of the opinion prior to 1956 that anyone who subdivided property and sold lots was a real estate dealer. Accordingly, plaintiff was listed variously as a real estate dealer or developer, and Burchett reported the gains as ordinary income.
21. While preparing plaintiff’s 1956 tax return Burchett questioned the procedure previously followed in designating plaintiff’s occupation and computing the tax. He asked plaintiff to find out if he was a real estate dealer. Plaintiff called a real estate office and was advised that they did not think he was a real estate dealer. Accordingly, Burchett reported the gain from the sale of lots in 1956,1957, and 1958 as long-term capital gain. The net gains for the years involved are as follows:
1956_$17,526.20
1957_ 13, 668.44
1958_ 21, 772.34
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petition is dismissed.

As I read the testimony of Hutchison, on which the court relies so heavily, it is not at all clear that the witness placed the conversation with the plaintiff in 1949, the time when plaintiff first agreed to purchase the land, rather than 1951 (when the first payment was made and the first lots were conveyed to plaintiff) or in 1952. In addition, Hutchison’s testimony as to the conversation was unelaborated and he admitted there was no discussion of subdividing or building, et cetera. Hutchison was the very last witness at the trial and plaintiff was the first. In these circumstances, the trial commissioner, who heard the testimony, could rightly decide that plaintiff was telling the truth when he said that he intended to farm the land when he bought it in 1949.

 As used herein, “plaintiff” shall refer to William, J. Miller.

 This figure should have been $9,896.24, apparently a typographical error in return.

 The $10,000 note was payable in 1 year; the $20,000 note had no specific due date.

 Because oí tlie previously existing exclusive contract with Bratten, plaintiff was forced to pay Bratten $1,802.50.

 The lots covered were 1-9, 12, 14, 16-21, 23, 26, 31, 35, and, 38 In Section 2 and lots 31-37 and 40-75, in Section 3.