**ANN ARBOR CONSTRUCTION COMPANY, a Construction Supplies Corporation of Ann Arbor in the State of Michigan**

v.

**UNITED STATES.**

Congressional No. 17871.

United States Court of Claims.

Nov. 30, 1954.

Harold Leventhal, Washington, D. C., Ginsburg, Leventhal, Washington, D. C., and Brown and Burke, Burke & Smith, Ann Arbor, Mich., on the brief, for plaintiff.

Howard O. Sigmond, Washington, D. C., J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

This is a congressional reference case referred to the Court of Claims by Senate Resolution 224, 82d Congress, 1st Session, with instructions to proceed in accordance with sections 1492 and 2509 of Title 28 of the United States Code, 28 U.S.C.A. §§ 1492, 2509.[1]

Pursuant to the aforementioned reference the plaintiff has filed its petition in this court seeking to recover the amount it spent in moving its concrete mixing plant.

From 1941 through 1943 plaintiff, as a materials supplier, furnished transit-mixed concrete to the prime contractor who had undertaken the building of Willow Run Bomber Plant. Originally it supplied this demand from its plant in Ann Arbor, Michigan, which is approximately 14 miles from the site of the Willow Run Bomber Plant.

In order to facilitate deliveries to Willow Run plaintiff secured a site for its transit-mixed concrete plant near Willow Run by lease dated May 31, 1941, from one Wiard for a term beginning May 10, 1941. The lease provided in part:

"The term of this lease shall be one year or the length of time required for the construction and completion of the so-called Bomber

Plant, now being erected for the Ford Motor Company on the south side of Ecorse Road, whichever is the longer. The party of the second part is to remove all construction both above and below the ground and to place in as near the condition originally found as is possible including reseeding. The fences are to be reset."

Pursuant to the lease, the plaintiff corporation erected a concrete mixing plant on the new site, which we will refer to as Site 1. Said plant was portable, although certain facilities used in conjunction therewith were fixed installations.

In November of 1941 the Michigan State Highway Department undertook to construct access roads to the bomber plant. It notified plaintiff by letter dated November 19, 1941 that Site 1 was being purchased by the state. The letter reads in part as follows:

"We have been notified that you are leasing property in Washtenaw County from Lyman E. and Florence P. Wiard, which property is described as follows:

\*　\*　\*　\*　\*　\*

"The Michigan State Highway Department is purchasing this property from Mr. and Mrs. Wiard for highway purposes in the vicinity, and as part of the consideration it has been agreed that your monthly payments on the lease are to be made to Mr. and Mrs. Wiard until May 10, 1942. If it is necessary for you to use the property after May 10, 1942, payments should be made to the

1. Sec. 1492 reads as follows: "The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress."

Sec. 2509 reads as follows: "Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and

report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

Michigan State Highway Department.

"Will you please acknowledge receipt of this notice by signing in the space provided below, returning the signed copy of the letter to this office."

The letter was acknowledged by plaintiff.

On January 6, 1942, the State of Michigan filed a condemnation suit to secure possession of land needed for the proposed extension of the highway system, including the land occupied by plaintiff as Site 1.

The Highway Department notified the plaintiff of the necessity of moving from Site 1 by a letter dated January 16, 1942. The state was unable to obtain possession of all of the necessary rights-of-way within the time required by the highway construction program, without the assistance of the Federal Government under the Defense Highway Act.

On January 30, 1942, the Highway Department requested the Federal Government to secure immediate possession and title on behalf of the state of the additional land, including land hereafter referred to as Site 2. The United States condemned the land and was reimbursed by the state for the cost of the acquisition. The United States did not deliver a deed for the property to the State of Michigan until September of 1945.

In May 1942 the state and plaintiff entered into an oral agreement whereby plaintiff moved to Site 2, furnished by the State of Michigan, and the state reimbursed plaintiff $8,498.39 for its moving expenses from Site 1 to Site 2. The oral arrangements provided that the occupancy of Site 2 by plaintiff would be on the same rental and for the same terms as the lease plaintiff had for Site 1. Plaintiff paid the stipulated rent to the Highway Department until October 10, 1943.

In July 1942, the Army requested and received authority to use the area including Site 2 for a temporary hospital. The state was aware of plaintiff's occupancy at the time but apprehended no potential conflict between the uses. Pursuant to this authority the Army constructed a temporary hospital on Site 2.

Difficulties arose from the simultaneous use of Site 2 by plaintiff's plant and the Army's temporary hospital. The Army complained that the noise from plaintiff's plant disturbed the hospital patients. Plaintiff was willing to vacate Site 2 if the Army would reimburse its costs of so doing. The dispute was brought to the attention of the Highway Department of the State of Michigan which attempted to explain the situation to the Army by letter dated February 8, 1943, reading in part as follows:

"Second, It is apparent that two different permissions were given concerning this property, and that in the matter of the presence of the Ann Arbor Construction Company's buildings on the property, these two permissions overlap and are inconsistent. The permission given to the Army Air Corps to use the Area for contonment [sic] purposes was promised in a letter of July 15, 1942, written by State Highway Commissioner Kennedy to Lieutenant Colonel F. I. Kennedy, C. E. Division Real Estate Director, Chicago, and covers the entire area between old Ecorse Road, Wiard Road, the Ford Railroad spur, and our new Expressway on the north.

"However, prior to this by a matter of several months, the Chief Engineer of the State Highway Department, learning that the Ann Arbor Construction Company was occupying property on the west side of Wiard Road under written lease and that it was directly in line of the Expressway, required that Company to move to the Foster property on the east side of Wiard Road, and agreed that they might remain thereon until the completion of the Bomber Plant. That Company's rent is paid to May 10, 1943.

"This was an authoritative commitment by the Highway Department and it appears to me that the

later permission to Lieutenant Colonel Kennedy in July 1942, is subject to the prior rights granted the Ann Arbor Construction Company by the Highway Department.

"Now as to the practical solution of this matter, I believe that the Ann Arbor Construction Company is getting very close to the end of its operations at that point and will vacate as soon as this time is at hand. Whether that will be before or after March 1, 1943, I have not yet been able to ascertain; but the Company has played a rather vital part in the furtherance of the project, is setting there on the strength of valid permission from this Department, and in all equity should not be disturbed in carrying out the last few weeks of its activities. I am sure that they will cooperate, as they have always done in the past, and that the entire matter will clear itself up in friendly fashion.

"I am seeking expression from Mr. Osgood of that Company as to the earliest date when he can remove whereupon the land will be available for your use. Since his plant occupies only a small portion at the extreme northeast corner, there certainly will be no objection to your occupying and using the remainder of the area at once."

The discord continued between plaintiff and the Army over arrangements for plaintiff to vacate Site 2. Plaintiff was advised in writing by the Army on July 14, 1943, that it would deny plaintiff access to Site 2 unless by August 15 plaintiff submitted a certificate from responsible Federal authority that it was performing work essential to the war effort and to secure a pass to permit it to come within the enclosure. Later the Army extended to October 1, 1943, the date by which plaintiff was to complete its evacuation of Site 2.

Between August and October 1943 plaintiff moved its plant from Site 2 and by January 22, 1944, had reestablished it at a location in Ypsilanti, Michigan, which is referred to as Site 3.

Shortly after plaintiff moved its plant from Site 2 the Army moved its hospital from Site 2 to another location on the airport at Willow Run.

Willow Run was substantially completed as of June 12, 1943 and had been in actual production since 1942. However, plaintiff continued to the end of 1943 to furnish concrete for the construction then underway of additional structures included in the original plans for Willow Run. After October 1, 1943, plaintiff's deliveries of concrete were made from its production at Site 3.

The agreement under which plaintiff occupied Site 2 had no market value over and above the agreed rental. There was at the time an availability of alternate sites in greater proximity to Willow Run than Site 3. The evidence does not disclose why plaintiff chose Site 3 in preference to a site more advantageously situated, nor that plaintiff was imprudent in doing so.

Plaintiff never moved its plant back to Site 2 and the evidence does not indicate that the Highway Department of the State of Michigan ever requested plaintiff to do so or that either party considered that plaintiff was obligated to do so. There was no likelihood that plaintiff would voluntarily elect to vacate Site 2 prior to its agreed term of its occupancy, had the Army not compelled it to vacate.

Plaintiff's cost of moving its plant from Site 2 to Site 3 was $18,095.73. The reasonable cost of the move from Site 2 to Site 3, based on a complete stoppage of work, would have been $9,142, but the circumstances attending the move included the necessity for uninterrupted service and delivery of concrete during the time of the move. Under the circumstances attending the move $18,095.73 was a reasonable cost.

The defendant has raised several legal defenses, one of which is sufficient to prevent legal recovery in this court.

The first of these is the statute of limitations. Any claim the plaintiff may have had arose at the very latest in October 1943, when plaintiff moved its plant from Site 2 to Site 3, or January 22, 1944, the date on which plaintiff had reestablished its plant at Site 3. Since the claim was not referred to this court by Congress until October 1951 and the petition was not filed until January 16, 1952, the claim would be barred by the 6-year limitation of 28 U.S.C. § 2501, 28 U.S.C.A. § 2501.

■ The second defense urged by the defendant is that the lease for Site 2 did not conform to the Michigan statute of frauds.

Plaintiff had a lease for Site 1. The State Highway Department acquired this site and notified plaintiff that after May 10, 1942, rent should be paid to the state. Thereafter the state took possession of Site 1 and notified plaintiff that it was necessary to terminate the lease as of May 10, 1942, and requested plaintiff to move. By *oral arrangements* between plaintiff and the state, the plaintiff moved to Site 2 on the same terms as plaintiff's lease for Site 1. The original lease provided that "The terms of this lease shall be one year or the length of time required for the construction and completion of the so-called Bomber Plant * * whichever is longer." The defendant says the oral arrangements meant to cover a period of a year or more as the original lease provided, and were void because it was in violation of the Michigan statute of frauds[2] which provided that "Every contract for the leasing for a longer period than 1 year, * * * shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease * * * is to be made, or by some person thereunto by him lawfully authorized in writing; * * *."

The third defense urged by defendant is that plaintiff has no legal or equitable right to recover moving expenses.

■ Whether or not plaintiff occupied the site under the terms of the original written lease, or as a permissive user, would not alter plaintiff's right to the occupancy of this land as opposed to the right of the Army. At the very least plaintiff's occupancy was under the same terms and conditions as that of the Army; *i. e.*, by permission of the Michigan State Highway Department. Plaintiff was occupying the site and his business was established by the time the Army's request to use the property in question was granted. It had a right to the occupancy of this land invaded by the Army which was superior to the right of any third person to oust it.

■ The record shows that if plaintiff had not been wrongfully dispossessed by the defendant, it could have continued in possession since the land has never been appropriated to different purposes and is still vacant. The rule of damages in cases of this kind is that damages should be such as will put plaintiff in the same condition he would have been if the injury had not been committed.

More specifically, the rule is that where removal is made necessary by the wrongful act of defendant plaintiff is entitled to recover the expenses of removal, 52 Am. Jur. 873; 63 C.J. 1039, 87 C.J.S., Trespass, § 108; 26 R.C.L. 974, and cases cited therein.

Applying this rule to the facts in this case, it is clear that the expenses of the unnecessary move should be borne by the defendant.

■ The defendant further urges that the military commanding officer was not authorized to make the representations and requests which resulted in plaintiff's moving from Site 2. That fact is not established by the record.

### Conclusion

Plaintiff's claim is barred by the 6-year statute of limitations which is sufficient to prevent legal recovery in this court. Lifting the bar of the statute of limitations would operate to create a legal obligation on the part of the Government to provide moving expenses.

2. Vol. 19, Mich.Stat.Ann. § 26.908, Comp.Laws 1948 Mich. § 566.108.

The facts show that plaintiff was engaged in supplying concrete at the site of a defense project and was forced to move its plant by reason of action of the Army. While it is a fact that plaintiff would have eventually had to move from Site 2 and bear the expense of moving, it did, in furtherance of the defense effort, continue its operations during the time of moving and was put to additional expense thereby. The evidence shows that the cost of moving was $18,095.73. The reasonable cost of the move, based on a complete stoppage of work, would have been $9,142. Therefore, because of the necessity for uninterrupted service and delivery of concrete during the move, plaintiff was put to the additional expense of $8,953.73.

While there is no obligation that can be enforced against the Government in this court because of the 6-year statute of limitations, we recommend a payment of $8,953.73 which in the light of all the facts of record seems to us to be fair and reasonable.

This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to Senate Resolution 224, 82d Congress, 1st Session.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact

The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff's petition was filed January 16, 1952, pursuant to the following Senate Resolution 224, adopted by the Senate of the United States October 19, 1951:

"*Resolved*, That the bill (S. 122) for the relief of the Ann Arbor Construction Company, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant."

2. Plaintiff is a Michigan corporation with its principal place of business in Ann Arbor, Michigan.

3. From 1941 through 1943 plaintiff, as a material supplier, furnished transit-mixed concrete at the site of the defense project known as the Willow Run Bomber Plant (hereafter Willow Run).

4. *a.* In order to facilitate deliveries to Willow Run, which was 14 miles from its Ann Arbor plant, plaintiff secured a site (hereafter Site 1) for its transit-mixed concrete plant near Willow Run by lease dated May 31, 1941, from one Wiard for a term beginning May 10, 1941. The lease provided in part:

"The term of this lease shall be one year or the length of time required for the construction and completion of the so-called Bomber Plant, now being erected for the Ford Motor Company on the south side of Ecorse Road, whichever is the longer. The party of the second part is to remove all construction both above and below the ground and to place in as near the condition originally found as is possible including reseeding. The fences are to be reset."

*b.* Thereafter plaintiff installed a transit-mixed concrete plant on Site 1. Such a plant is portable, although certain facilities used in conjunction therewith are fixed installations.

5. The State of Michigan through its State Highway Department (hereafter Highway Department) undertook to develop a series of defense highways to serve Willow Run. In the course of lay-

ing out the highway system it became apparent that it would transect plaintiff's transit-mixed concrete plant on Site 1.

6. In connection with securing the extension of the highway system serving Willow Run, the Highway Department sent a letter to plaintiff dated November 19, 1941, reading in part as follows:

"We have been notified that you are leasing property in Washtenaw County from Lyman E. and Florence P. Wiard, which property is described as follows:

\* \* \* \* \* \*

"The Michigan State Highway Department is purchasing this property from Mr. and Mrs. Wiard for highway purposes in the vicinity, and as part of the consideration it has been agreed that your monthly payments on the lease are to be made to Mr. and Mrs. Wiard until May 10, 1942. If it is necessary for you to use the property after May 10, 1942, payments should be made to the Michigan State Highway Department.

"Will you please acknowledge re-receipt of this notice by signing in the space provided below, returning the signed copy of the letter to this office."

The letter was acknowledged by plaintiff.

7. On January 6, 1942, the State of Michigan filed a condemnation suit to secure possession of land needed for the proposed extension of the highway system, including the land occupied by plaintiff as Site 1 as well as land later occupied by plaintiff as Site 2, as will appear.

8. The Highway Department notified the plaintiff of the necessity of moving from Site 1 by a letter dated January 16, 1942, reading as follows:

"On November 19, 1941, we notified you that the State Highway Department purchased property in Washtenaw County formerly owned by Lyman E. and Florence P. Wiard, on which parcel you held a lease for the purpose of operating a Transit Mixed Concrete Plant.

"We are informed by our engineer that this parcel will be needed for construction purposes early this Spring, and it will be necessary to terminate the lease on May 10, 1942, the date set up in the instrument.

"Would it be possible for you to move your Plant to some other location and inform us when you have done so?"

9. *a.* It became apparent that the Highway Department could not secure possession and title to all of the land needed for the access roads to Willow Run with required promptness without the assistance of the Federal Government under the Defense Highway Act, 23 U.S.C.A. § 106. Therefore, on January 30, 1942, the Highway Department requested that the Federal Government secure immediate possession and title on behalf of the State of the additional land, including land referred to herein as Site 2. Subsequently, a Federal condemnation proceeding was instituted and a declaration of taking filed, the estimated just compensation deposited into court, and a fee simple legal title to the property referred to herein as Site 2 vested in the United States of America in March 1942. The condemnation documents of record do not divulge unaided that title to the property was taken by the United States Government for the benefit of the State.

*b.* Although the State of Michigan promptly reimbursed the United States Government for the latter's payment of just compensation to the owners of the property taken, formal delivery of title to the property to the Highway Department was not made until September 1945, due to certain intervening delays not here material.

10. *a.* On or about May 10, 1942, plaintiff, at the request of the Highway Department, vacated Site 1 and moved its plant to Site 2, which was nearby, and was subsequently reimbursed by the State in the amount of $8,498.39 for its moving expenses. The oral arrangement between the Highway Department

and plaintiff covering the latter's occupancy of Site 2 provided that the terms would be the same as the lease covering plaintiff's occupancy of Site 1.

*b.* Plaintiff paid the stipulated rent to the Highway Department until October 10, 1943.

11. By letter dated July 15, 1942, the Highway Department granted the Army's request to use certain described property which included Site 2 for the duration of the war and six months thereafter. No mention was made in the letter as to plaintiff's tenancy. The Highway Department was aware of plaintiff's occupancy at the time but apprehended no potential conflict between the uses. Pursuant to this authority, the Army constructed a temporary hospital facility on Site 2.

12. Difficulties arose from the simultaneous use of Site 2 by plaintiff's plant and the Army's temporary hospital, and resulted in an exchange of correspondence and frequent requests from the Army to the plaintiff to move from the site. The Army complained that the noise from plaintiff's plant disturbed the hospital patients. Plaintiff was willing to vacate Site 2 if the Army would reimburse its costs of so doing. The dispute was brought to the attention of the Highway Department which attempted to explain the situation to the Army by a letter dated February 8, 1943, reading in part:

"Second, It is apparent that two different permissions were given concerning this property, and that in the matter of the presence of the Ann Arbor Construction Company's buildings on the property, these two permissions overlap and are inconsistent. The permission given to the Army Air Corps to use the Area for contonment [sic] purposes was promised in a letter of July 15, 1942, written by State Highway Commissioner Kennedy to Lieutenant Colonel F. I. Kennedy, C. E. Division Real Estate Director, Chicago, and covers the entire area between old Ecorse Road, Wiard Road, the Ford Railroad spur, and our new Expressway on the north.

"However, prior to this by a matter of several months, the Chief Engineer of the State Highway Department, learning that the Ann Arbor Construction Company was occupying property on the west side of Wiard Road under written lease and that it was directly in line of the Expressway, required that Company to move to the Foster property on the east side of Wiard Road, and agreed that they might remain thereon until the completion of the Bomber Plant. That Company's rent is paid to May 10, 1943.

"This was an authoritative commitment by the Highway Department and it appears to me that the later permission to Lieutenant Colonel Kennedy in July, 1942, is subject to the prior rights granted the Ann Arbor Construction Company by the Highway Department.

"Now as to the practical solution of this matter, I believe that the Ann Arbor Construction Company is getting very close to the end of its operations at that point and will vacate as soon as this time is at hand. Whether that will be before or after March 1, 1943, I have not yet been able to ascertain; but the Company has played a rather vital part in the furtherance of the project, is setting there on the strength of valid permission from this Department, and in all equity should not be disturbed in carrying out the last few weeks of its activities. I am sure that they will cooperate, as they have always done in the past, and that the entire matter will clear itself up in friendly fashion.

"I am seeking expression from Mr. Osgood of that Company as to the earliest date when he can remove whereupon the land will be available for your use. Since his plant occupies only a small portion at the extreme northeast corner, there certainly will be no objection to your

occupying and using the remainder of the area at once."

13. The discord continued between plaintiff and the Army over arrangements for plaintiff to vacate Site 2. Plaintiff was advised in writing by the Army on July 14, 1943, that it would deny plaintiff access to Site 2 unless, by August 15, plaintiff submitted a certificate from responsible Federal authority that its contract operations were essential to the war effort, that the major part of the plant's production was so engaged, that replacement was impossible, and would also submit an estimate as to when plaintiff's contract operations would be completed. Later the Army extended to October 1, 1943, the date by which plaintiff was to complete its evacuation of Site 2. These representations on behalf of the Army were made to plaintiff pursuant to instructions of the military commanding officer of that area, through his subordinates, but the record does not establish the authority of the commanding officer to negotiate such arrangements.

14. Between August and October 1943, plaintiff moved its plant from Site 2 and, by January 22, 1944, had reestablished it at a location in Ypsilanti, Michigan, referred to hereafter as Site 3. Site 3 involved from 2½ to 4½ miles in additional shipping distances in deliveries of concrete by plaintiff to various points at Willow Run, but for the most part the greater costs resulting from longer hauls were absorbed by higher prices. Plaintiff was still in production at Site 3 at the time of the hearing in this case.

15. Shortly after plaintiff moved its plant from Site 2, the Army moved its hospital from Site 2 to another location on the airport at Willow Run.

16. While Willow Run was substantially completed as of June 12, 1943, and had been in actual production since 1942, plaintiff continued to the end of 1943 to furnish concrete for the construction then under way of additional structures included in the original plans for Willow Run. After October 1, 1943, plaintiff's deliveries of concrete were made from its production at Site 3.

17. The agreement under which plaintiff occupied Site 2 had no market value over and above the agreed rental. There was at the time an availability of alternate sites of comparable rental value in greater proximity to Willow Run than Site 3. The evidence does not disclose why plaintiff chose Site 3 in preference to a site more advantageously situated, nor that plaintiff was imprudent in doing so.

18. Plaintiff never moved its plant back to Site 2. The evidence does not indicate that the Highway Department ever requested plaintiff to do so or that either party considered plaintiff was obligated to do so. The evidence discloses no likelihood that plaintiff would have voluntarily elected to vacate Site 2 prior to the agreed term of its occupancy had the Army not compelled it to vacate.

19. Plaintiff's cost in moving its plant from Site 2 to Site 3 was $18,095.73. The reasonable cost of the move from Site 2 to Site 3 based on a complete stoppage of work would have been $9,142, but the circumstances attending the move included the necessity for uninterrupted service and delivery of concrete during the time of the move. Under the circumstances attending the move, $18,095.-73 was a reasonable cost. The evidence does not disclose what the reasonable cost would have been had plaintiff moved to a location closer to Site 2 than was Site 3.

20. Plaintiff's requests for reimbursement in the amount of $18,095.73 were refused by the Army and the Comptroller General.