See also, 35 Fed.Cl. 63.

INSLAW, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–338X.

United States Court of Federal Claims.

March 29, 1996.

C. Neal Pope, Atlanta, GA, for plaintiffs. James L. Malone, III and Charles R. Work, McDermott, Will & Emery; Philip L. Kellogg and James L. Lyons, Kellogg, Williams & Lyons; Michael L. McGlamry and William U. Norwood, Pope, McGlamry, Kilpatrick & Morrison, Atlanta, GA; and Earle F. Lasseter and Joan S. Redmond, Pope, McGlamry, Kilpatrick & Morrison, Columbus, GA, of counsel.

Sandra P. Spooner, Allen L. Lear, and Anthony J. Ciccone, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Beth E. Cook, Cathy J. Burdette, and William A. Rivera, of counsel.

## OPINION

MILLER, Judge.

This congressional reference is before the court on defendant's motion *in limine,* or alternatively, for partial summary judgment on the contractual data rights issue. Argument is deemed unnecessary. This case was

assigned to the court pursuant to 28 U.S.C. § 1492 (1994), which provides: "Any bill, except a bill for a pension, may be referred by either House of Congress to the chief judge of the United States Court of Federal Claims for a report in conformity with section 2509 of this title." Section 2509(c) charges the court to proceed "in accordance with the applicable rules to determine the facts.... [The court] shall append to [its] findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant." By its motion defendant seeks a ruling that the Government conclusively possesses all the rights to contractual data that the claimants seek to enforce.

## FACTS

The following facts include only those undisputed facts necessary for a determination of the issues presented by defendant's motion. Considering the long litigation history between the parties before the matter was referred to the United States Court of Federal Claims, the court permitted IN-SLAW, Inc.,[1] to "ignore defendant's reliance on testimony [and evidentiary material in its proposed findings of uncontroverted fact] because those issues, obviously, can be controverted." Transcript of Proceedings, *INSLAW, Inc. v. United States*, No. 95–338X, at 8 (Fed.Cl. Jan. 29, 1996). Indeed, much of the evidence that defendant cites to support its proposed findings is excerpted from depositions and trial testimony, the latter pointedly controverted by INSLAW, which prevailed in an earlier trial, although the findings subsequently were vacated. In these circumstances the court is in no position on summary judgment to credit one side's selected factual scenario over the other's. The court therefore confines its inquiry to the relevant contractual language and makes legal determinations based on that language in order to resolve the issues that properly can be resolved at this time.

On March 16, 1982, INSLAW entered into a $9.6 million cost plus basis contract, No. JVUSA–82–C–0074, with the Executive Office for United States Attorneys (the "EOUSA") of the Department of Justice ("DOJ"), which required INSLAW to prepare and install 1) the computer-based public domain PROMIS software in the EOUSA and in the 20 largest United States Attorneys' Offices, with an option by which DOJ could require installation of the software in another 10 offices; and 2) a word processor-based case-tracking system in the remaining smaller United States Attorneys' Offices. PROMIS, the popular name for the "Prosecutor's Management Information System," is used for case-tracking purposes. There are two versions of PROMIS at issue. The "VAX" version of PROMIS was made available to DOJ via telephone lines through INSLAW's own in-house VAX computer. The "PRIME" version of PROMIS was made available to DOJ upon INSLAW's installation of the system on government-furnished computers.[2]

Clause 74(b)(1) of the contract gave the Government unlimited rights[3] in:

(i) technical data and computer software resulting directly from performance of experimental, developmental or research work which was specified as an element of performance in this or any other Government contract or subcontract;

(ii) computer software required to be originated or developed under a Government contract, or generated as a necessary part of performing a contract;

(iii) computer data bases, prepared under a Government contract, consisting of information supplied by the Government, infor-

---

1. Plaintiffs in this congressional reference include the owners of INSLAW, although prior proceedings were brought by INSLAW alone. The term "INSLAW" herein includes the other named plaintiffs.

2. This opinion does not address any issues involved in the "delivery ... of the proprietary IBM mainframe version of PROMIS to the Land and Natural Resources Division of [DOJ] under a May 1982 Software Support Agreement." Def's Br. filed Feb. 20, 1996, at 6.

3. Clause 74(a)(7) defines "Unlimited Rights" as "rights to use, duplicate, or disclose technical data or computer software in whole or in part, in any manner and for any purpose whatsoever, and to have or permit other[s] to do so."

mation in which the Government has unlimited rights, or information which is in the public domain;

(iv) technical data necessary to enable manufacture of end-items, components and modifications, or to enable the performance of processes, when the end-items, components, modifications or processes have been, or are being, developed under this or any other Government contract or subcontract in which experimental, developmental or research work is, or was specified as an element of contract performance, except technical data pertaining to items, components, processes, or computer software developed at private expense (but see [clause 74(b) ] (2)(ii) below);

(v) technical data or computer software prepared or required to be delivered under this or any other Government contract or subcontract and constituting corrections or changes to Government-furnished data or computer software;

(vi) technical data pertaining to end-items; components or processes, prepared or required to be delivered under this or any other Government contract or subcontract, for the purpose of identifying sources, size, configuration, mating and attachment characteristics, functional characteristics and performance requirements ...;

(vii) manuals or instructional materials prepared or required to be delivered under this contract or any subcontract hereunder for installation, operation, maintenance or training purposes;

(viii) technical data or computer software which is in the public domain, or has been or is normally furnished without restriction by the Contractor or subcontractor; and

(ix) technical data or computer software listed or described in an agreement incorporated into the schedule of this contract which the parties have predetermined, on the basis of subparagraphs (i) through (viii) above, and agreed will be furnished with unlimited rights.

Clause 74(b)(2) states that the Government shall have Limited Rights [4] in:

(i) technical data, listed or described in an agreement incorporated into the Schedule of this contract, which the parties have agreed will be furnished with limited rights; and

(ii) technical data pertaining to items, components or processes developed at private expense, and computer software documentation related to computer software that is acquired with restricted rights, other than such data as may be included in the data referred to in [Clause 74] (b)(1)(i), (v), (vi), (vii), and (viii). [P]rovided that only the portion or portions of each piece of data to which limited rights are to be asserted pursuant to (2)(i) and (ii) above are identified (for example, by circling, underscoring, or a note), and that the piece of data is marked with the [limited rights] legend below ....

The portion of Clause 74(b)(2) of the contract labeled "LIMITED RIGHTS LEGEND" is marked prominently "N/A," signifying not applicable.

Clause 74(b)(3) is entitled "Restricted Rights" [5] and states, in part:

The Government shall have restricted rights in computer software, listed or described in a license or agreement made part of this contract, which the parties have agreed will be furnished with restricted rights.... Such restricted rights are of no effect unless the computer software

---

4. Clause 74(a)(8) defines "Limited Rights" as "rights to use, duplicate, or disclose technical data, in whole or in part, by or for the Government, with the express limitation that such technical data shall not, without the written permission of the party furnishing such technical data be (a) released or disclosed in whole or in part outside the Government, (b) used in whole or in part by the Government for manufacture, or in the case of computer software documentation, for preparing the same or similar computer software...."

5. Clause 74(a)(9) defines "Restricted Rights" as rights that "apply only to computer software" and include, in part, a right to:

(i) use computer software with the computer for which or with which it was acquired ...;
(ii) use computer software with a backup computer ...;
(iii) copy computer programs for safekeeping (archives) or backup purposes[.]

is marked by the Contractor with the following legend....

The portion of Clause 74(b)(3) labeled "RESTRICTED RIGHTS LEGEND" also is marked prominently "N/A."

Other relevant sections of the contract include Article XXXVII, which states:

> The Contractor shall be responsible for meeting the minimum standards of reliability and performance.... In the event the Contractor fails to meet these minimum performance standards, the Government may require the Contractor to replace the computer equipment and/or facilities and render other consideration to the Government as determined appropriate by the Contracting Officer.

Article XXVIII of the contract establishes a rule of nonpayment for additional work:

> Any additional work or services or a change to work specified herein which may be performed by the Contractor, either at his own volition or at the request of an individual other than a duly appointed Contracting Officer except as may be explicitly authorized in the contract, are not authorized and will not be paid for by the Government....

Finally, Article XXX of the contract granted the Government the right to require INSLAW to deliver certain materials upon request:

> A. To the extent that [certain] data is [sic] not elsewhere required to be furnished to the Government under this contract ... the contractor, upon written request of the Contracting Officer at any time during the contract performance or within one year after final payment, necessary to explain or help Government technical personnel understand computer programs developed under this contract [will provide]:
>
> (1) A copy (which shall be a reproducible master if one is so requested) of flow charts, algorithms and other data used in or prepared in connection with the development, practice and testing of the computer programs required under this contract.
>
> ....

> B. All reports, data, and recorded information which are required to be furnished by the Contractor under this provision, as well as all other reports of a technical nature required to be furnished under this contract are "subject data" within the meaning of the Clause 74 of this contract....

The contract's Statement of Work instructs the contractor:

> 3.2.4.1 Every system installed by the Contractor shall be subject to evaluation and review by the government based on operational experience with the system. The Contractor shall assist the users with modifications to their systems which have been approved by the COTR [contracting officer's technical representative]....
>
> 3.2.4.2 All systems enhancements, modifications, and development performed pursuant to this contract shall be incorporated within the systems which have already been installed in the U.S. Attorneys' Offices....

After a number of disputes between INSLAW and DOJ—regarding, among other issues, the funding of certain alleged enhancements made to the PROMIS system and the extent of the Government's rights in the PROMIS system—the parties entered into a bilateral modification of the contract on April 11, 1983. Contract Modification No. P0012 states, in pertinent part:

> The purpose of this Supplemental Agreement is to effect delivery to the Government of VAX–Specific PROMIS computer programs and documentation requested by the Government on December 6, 1982, pursuant to Article XXX—Date Requirements, and to at this time resolve issues concerning advance Payments to the Contractor.
>
> A. The Contractor shall deliver to the Government all PROMIS Computer programs and supporting documentation developed for or relating to this contract....
>
> ....
>
> The information provided pursuant to this request must include everything necessary to transfer all above mentioned operational versions of PROMIS to a differ-

ent VAX computer with a minimum of effort, and to further develop, tailor, and implement PROMIS software to the extent contemplated in this contract on a different VAX computer.

B. The Government shall limit and restrict the dissemination of the said PROMIS computer software to the ... [EOUSA], and to the 94 United States Attorneys' Offices covered by the Contract, and, under no circumstances shall the Government permit dissemination of such software beyond these designated offices, pending resolution of the issues extant between the Contractor and the Government under the terms and conditions of Contract No. JVUSA–82–C–0074; and

. . . .

E. Contract No. JVUSA–82–C–0074 governs the rights and obligations of the parties thereto. Neither the Government nor the Contractor intend by means of the Supplemental Agreement to change or affect in any way the terms and conditions of the said Contract. . . . Rather, this Supplemental Agreement to the Contract is intended solely and only to assure access by the Government to the current software utilized by the Contractor in performance under the Contract, and to limit dissemination of the same by the Government, as set forth above, pending a decision with respect to the data rights in enhancements to VAX computer software being used to run U.S. Attorney[s'] PROMIS. . . .

All other terms and conditions remain unchanged.

INSLAW finished work on the contract by approximately March 15, 1985.[6] On October 17, 1985, INSLAW filed a claim with Contracting Officer Peter Videnieks seeking additional compensation with respect to certain alleged privately-funded enhancements contained in the PROMIS system. "INSLAW based its claim for $2,910,000.00 on its assertion of proprietary rights to privately-fi-

nanced enhancements incorporated into the version of the PROMIS software that IN-SLAW manufactured for the [EOUSA]." On February 21, 1986, the contracting officer issued his final decision. As to INSLAW's claim for compensation for alleged privately-funded enhancements, Mr. Videnieks concluded: "INSLAW's claim for licensing fees in the amount of $2,910,000.00 is denied in its entirety."

INSLAW did not seek review of the contracting officer's decision on the contractual data rights issue in either the United States Claims Court, now the United States Court of Federal Claims, or the Department of Transportation Contract Appeals Board (the "DOTCAB").[7] INSLAW instead opted to litigate the issue in conjunction with a bankruptcy proceeding. After the bankruptcy court awarded damages and attorneys' fees to INSLAW, which the district court upheld, the decision was vacated on jurisdictional grounds. *See generally INSLAW, Inc. v. United States*, 88 B.R. 484 (Bankr.D.D.C. 1988), *aff'd, United States v. INSLAW, Inc.*, 113 B.R. 802 (D.D.C.1989), *rev'd*, 932 F.2d 1467 (D.C.Cir.1991), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). The time for appealing the contracting officer's decision to the DOTCAB expired on May 22, 1986, and to the Claims Court on February 21, 1987. *See* 41 U.S.C. §§ 606, 609(a)(3) (1982).

## DISCUSSION

### 1. *Nature of congressional reference*

■ A congressional reference is a unique mechanism that allows a party to seek relief through a private bill passed by one house of Congress. *See* 28 U.S.C. § 1492 (1994). As our predecessor court, the Court of Claims, stated:

Congressional [reference] cases, of which this case is one, are peculiar to the jurisdiction of this court alone and have their origin in those acts ... which authorize

---

6. On February 13, 1984, the Government unilaterally terminated for convenience of the Government the portion of the contract obligating IN-SLAW to install a word processor-based version of PROMIS in the smaller United States Attorneys' Offices.

7. INSLAW did seek review by the DOTCAB of decisions by the contracting officer on other cost claims relating to the contract that were not pertinent to this opinion. *See, e.g., Appeals of INSLAW, Inc.*, Contract JVUSA–82–C–0074, Nos. 1609, 1775, 1828 (DOT Nov. 9, 1992).

either house ... of Congress to refer certain bills for a judicial investigation upon which findings are to be made and reported to the body transmitting the resolution. They are a separate class of cases designed to supply information so full and exact as to leave the legislative body nothing to do but determine the justice of the complaint ... as a legal or equitable demand against the United States....

*Alleman v. United States,* 43 Ct.Cl. 144, 150–51, 1900 WL 1539 (1908). The present matter derives from a bill offered by Senator Hatch and referred to the Committee on the Judiciary that provided, in part:

SECTION 1. The Secretary of the Treasury shall pay, out of any money in the Treasury not otherwise appropriated, the sum due, if any, jointly to Inslaw, Inc. a Delaware Corporation, and William A. Hamilton and Nancy Burke Hamilton for damages incurred arising from claims relating to the furnishing of computer software and services to the United States Department of Justice.

SEC. 2. (a) The payment made pursuant to the first section of this Act shall constitute full settlement of all legal and equitable claims by Inslaw, Inc., and William A. Hamilton and Nancy Burke Hamilton against the United States, or any agency, official, officer, employee, or agent thereof.

S.740, 104th Cong., 1st Sess. (1995). On May 3, 1995, the Senate agreed to the following resolution:

*Resolved.* That the bill S.740, entitled "A bill for the relief of Inslaw, Inc., and William A. Hamilton and Nancy Burke Hamilton" now pending in the Senate, together with all the accompanying papers, is referred to the chief judge of the United States Court of Federal Claims. The chief judge shall proceed with the same in accordance with provisions of sections 1492 and 2509 of title 28, United States Code, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due to the claimants from the United States.

S.Res. 114, 104th Cong., 1st Sess. (1995). The congressional reference thus instructs the court to ascertain whether INSLAW has presented sufficient evidence to support a claim for legal or equitable relief or relief in the form of a gratuity.

 In the context of a congressional reference, "legal claim" implies no special meaning. A legal claim arises upon the invasion of a party's legal rights. Such a legal right can be "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Tennessee Elec. Power Co. v. TVA,* 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939). A legal claim must be one conferred by the "substantive law, *i.e.,* the Constitution, a statute, a regulation, or some principle of common law, and is based on the invasion of a legal right." *Land v. United States,* 29 Fed.Cl. 744, 751 (1993). An "equitable claim," in the context of a congressional reference, does not mean a claim in equity in the technical sense, but rather a broad moral right to recover based upon general equitable considerations. *See, e.g., Adams v. United States,* 175 Ct.Cl. 288, 358 F.2d 986 (1966). " 'An equitable claim on a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrongdoing] on the part of government employees, any award herein would be a gratuity.' " *California Canners & Growers Ass'n v. United States,* 9 Cl.Ct. 774, 785 (1986) (review panel) (quoting *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. Nov. 23, 1977)). A gratuity is an award given to a party absent a sufficient finding of grounds for either legal or equitable relief. *Gordon v. United States,* 148 Ct.Cl. 31, 40, 180 F.Supp. 591, 596 (1960); *see also Spalding & Son, Inc. v. United States,* 28 Fed.Cl. 242, 250–51 (1993).

### 2. *Standard of review*

 Defendant has moved for a ruling *in limine* or, alternatively, partial summary judgment. The basic purpose of a motion *in*

*limine* is "to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters. Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial." *Baskett v. United States,* 2 Cl.Ct. 356, 367–68 (1983), *aff'd,* 790 F.2d 93 (Fed.Cir.) (Table), *cert. denied,* 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986). In this manner the court filters out irrelevant evidence and performs its function of "simplifying issues for trial." *Baskett,* 2 Cl.Ct. at 359. Nevertheless, granting a motion *in limine* should not "preclude plaintiffs from receiving a fair trial." *Id.* at 368 (citing *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 505 F.Supp. 1125, 1140–42 (E.D.Pa.1980), *aff'd in part, rev'd in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 238 (3d Cir.1983), *rev'd sub nom. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ A motion for partial summary judgment should be granted when, as to a particular issue, no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Defendant's motion properly can intercede and prevent trial if the motion demonstrates that trial would be useless because additional evidence, beyond that available in connection with its motion, could not reasonably be expected to change the result. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986)).

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555; *see also Universal Life Church, Inc. v. United States,* 13 Cl.Ct. 567, 580 (1987) (citing cases), *aff'd,* 862 F.2d 321 (Fed.Cir.1988) (Table). A trial court may deny summary judgment, however, if "there is reason to believe that the better course would be to proceed to trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (citation omitted).

### 3. *Rules of contract interpretation*

■ Questions of contract interpretation are questions of law that may be resolved by summary judgment. *Muniz v. United States,* 972 F.2d 1304, 1309 (Fed.Cir. 1992); *Fortec Constr. v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). When resolving a question of contract interpretation, the court's primary purpose is to ascertain the intention of the contracting parties. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988) (citing S. Williston, A Treatise on the Law of Contracts § 601 (3d ed.1961)). An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983) (*followed in Fortec,* 760 F.2d at 1292). An agreement should be read as a whole so as to avoid conflicts between provisions within the contract. *Reliance Ins. Co. v. United States,* 931 F.2d 863, 865 (Fed.Cir.1991); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). As a matter of contract interpretation, evidence outside the contract only should be considered if the contract is ambiguous. *Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). A contract is ambiguous if it is amenable to more than one reasonable interpretation. *S.W. Aircraft, Inc. v. United States,* 213 Ct.Cl. 206, 212, 551 F.2d 1208,

1212 (1977). A contract is not rendered necessarily ambiguous merely because the parties disagree over the meaning of a particular contract provision. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970). While the construction of an unambiguous writing is an appropriate matter for summary judgment, language that is reasonably susceptible to more than one interpretation may be considered ambiguous and thus not appropriate for summary judgment. *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 169 (D.C.Cir.1981).

▇▇▇▇▇ INSLAW argues that the court must interpret the evidence independently of the contractual provisions, because the Government allegedly obtained INSLAW's property by tortious acts. This argument, however, misconceives the role of a motion *in limine* or for partial summary judgment in the context of a congressional reference. That Congress referred the matter to the court for fact-finding does not sweep aside the substantial case law that the court and its predecessors have developed both with respect to how the court is to discharge its task to interpret contracts and what legal consequences flow from certain contractual provisions. Nor does a motion *in limine* or for partial summary judgment short-circuit the procedure that Congress intended to apply to congressional reference cases. INSLAW will have a trial on all contested factual issues, but the meaning of clear, unambiguous English in a contract is not among them.

### 4. *Unlimited and Limited Rights*

▇▇▇ The first issue to be addressed is the nature and extent of the rights to the software given by the contract itself, for the moment excluding consideration of Modification 12. Clause 74(b)(1) of the contract concerns the extent of the Government's rights in the software and other technical data. This section of the clause is entitled "Unlimited Rights," and it outlines in clear and unambiguous language the Government's unbounded rights in "technical data," "computer software," and "computer data bases."

The Government's Unlimited Rights in these materials apply whether the materials were created for "developmental or research work," "as an element of performance," required "under a Government contract," or created "to enable manufacture of end-items, components and modifications." Clause 74(b)(1) places no limits whatsoever on the Government's rights to obtain, use, or disseminate these materials.

Clause 74(b)(2), entitled "Limited Rights," covers those circumstances in which the Government would have limited rights in software or other technical data. Section (b)(2)(i) states that the Government will have Limited Rights in certain materials when there is "an agreement incorporated into the Schedule of this contract, which the parties have agreed will be furnished with limited rights." Section (b)(2)(ii) outlines when "technical data pertaining to items, components or processes developed at private expense" will be subject to limited government rights. It sets forth a procedure by which these materials can be furnished with only Limited Rights for the Government. This procedure includes identification of the material "by circling, under-scoring, or a note" and the marking of the material with a "LIMITED RIGHTS LEGEND."[8] The executed contract, however, contains two "N/A's" written on the section describing the Limited Rights Legend. The parties do not dispute the presence of the notation. Although INSLAW disputes the significance of the term, it is incontrovertible that the notation was written on the contract and that it means "not applicable."

Section (b)(3) of Clause 74, entitled "Restricted Rights," states that "[t]he Government shall have restricted rights in computer software, listed or described in a license or agreement made part of this contract, which the parties have agreed will be furnished with restricted rights." It further states that such Restrictive Rights are not effective unless the software is marked with the "RESTRICTIVE RIGHTS LEGEND." The executed contract, however, displays the letters

---

8. The Limited Rights Legend would include the number of the prime contractor who delivered the item, the name of the contractor or subcontractor who generated the items, and an explanation of the method used to identify the Limited Rights data.

"N/A" on the section describing the Restricted Rights Legend. Again, no dispute exists as to the presence and meaning of this notation.

It is clear from an examination of the contract, for the moment ignoring Modification 12, that it conferred upon the Government Unlimited Rights in computer software and other technical data. Furthermore, the "N/A" notations, on the two Clause 74 sections dealing with limitations in the Government's rights, indicate that these contract provisions were inoperative and did not limit the Government's rights. INSLAW may attempt to show that the "N/A" notations had some other purpose or use, but such an effort very likely will prove fruitless. Consequently, the contract itself, without consideration of Modification 12, fully empowered the Government to use INSLAW's computer software and other technical data in whatever manner it deemed proper, including, but not limited to, dissemination of these materials beyond the EOUSA and the United States Attorneys' Offices.

### 5. *Modification 12*

Although the extent of the Unlimited Rights given the Government by the contract was broad, those rights were altered by the bilateral modification entered into by the parties on April 11, 1983. As Modification 12 states: "The purpose of this Supplemental Agreement is to effect delivery to the Government of VAX–Specific PROMIS computer programs and documentation requested by the Government on December 6, 1982, pursuant to Article XXX." It required "[t]he Contractor [to] deliver to the Government all PROMIS Computer programs." It further stipulated that the contractor "must include everything necessary to transfer all above mentioned operational versions of PROMIS to a different VAX computer." In return for this delivery, the Government promised to "restrict the dissemination of the said PROMIS computer software to the ... [EOUSA], and to the 94 United States Attorneys' Offices." Finally, Modification 12 stated that it did not "change or affect in any way the terms and conditions" of the contract, and that its only purpose was "to assure access by the Government to the current software utilized by the Contractor ... pending a decision with respect to the data rights in enhancements to VAX computer software being used to run U.S. Attorney[s'] PROMIS."

Defendant contends that Modification 12 applies only to the VAX version of PROMIS and, throughout the events at issue in this case, that the Government maintained Unlimited Rights to the PRIME version of PROMIS. INSLAW argues that Modification 12 applies to both the VAX and the PRIME versions. An examination of the modification's language strongly supports a construction that it was intended to apply only to the VAX version. Modification 12 mentions the term "VAX" five times; PRIME is not mentioned. Moreover, the modification addresses several technical issues involved in transferring the VAX version of PROMIS from INSLAW's VAX computer to a government VAX computer; issues involved in the transfer of the PRIME version are not addressed. These factors indicate that Modification 12 was intended to apply solely to the VAX version.

Nonetheless, the court is given pause by the statement in Modification 12 that INSLAW must deliver "all PROMIS Computer programs and supporting documentation developed for or relating to this contract." This sweeping statement seems to encompass both the VAX and PRIME versions. It renders Modification 12 sufficiently ambiguous so as to allow INSLAW to introduce extra-contractual evidence to argue that Modification 12 applies to the PRIME version. *See Sylvania Elec. Prods.,* 198 Ct.Cl. at 126, 458 F.2d at 1005. However, the court will limit INSLAW to the following evidence to prove its argument: 1) evidence that, as a result of, and pursuant to Modification 12, INSLAW gave the Government software or other technical data related to the PRIME version of PROMIS; and 2) contemporaneous statements or documentary evidence, from INSLAW or government officials involved in the drafting of Modification 12, that the parties intended the modification to apply to the PRIME version. If INSLAW is unable to offer such evidence, the court will find

that Modification 12 applies only to the VAX version, and any claim by INSLAW for recovery based on the deprivation, conversion, dissemination, or other use complained of with respect to the PRIME version, whether endowed with privately-funded enhancements or not, will provide no basis for relief. Such a result is mandated by the broad and Unlimited Rights for software and other technical data that the contract accords to the Government.

### 6. *INSLAW's legal claims*

Congress commanded the court to determine whether INSLAW has a "claim, legal or equitable, against the United States ... and the amount, if any, legally or equitably due to claimants from the United States." S.Res. 114, 104th Cong., 1st Sess. (1995). After the contract was completed, INSLAW filed a claim with the contracting officer on October 17, 1985, seeking additional compensation on issues relating to alleged privately-funded enhancements. On February 21, 1986, the contracting officer issued his final decision, ruling: "INSLAW's claim for licensing fees ... is denied in its entirety." INSLAW had 90 days to appeal this decision to the DOT-CAB, *see* 41 U.S.C. § 606 (1982), or 12 months to appeal to the Claims Court, *see* 41 U.S.C. § 609(a)(3) (1982).

 INSLAW sought review by the DOTCAB, but not with respect to the contractual data rights issue. *See, e.g., Appeals of INSLAW, Inc.,* Contract JVUSA–82–C–0074, Nos. 1609, 1775, 1828 (DOT Nov. 9, 1992). INSLAW declined to seek review in the Claims Court. In the context of a congressional reference, failure to meet a statute of limitations bars legal recovery. *See, e.g., Clark v. United States,* 167 Ct.Cl. 197, 198, 1964 WL 8610 (1964); *Erie R.R. Co. v. United States,* 140 Ct.Cl. 398, 399, 156 F.Supp. 908, 909 (1957); *Ann Arbor Constr. Co. v. United States,* 130 Ct.Cl. 244, 253, 126 F.Supp. 161, 166 (1954); *Land,* 29 Fed.Cl. at 751; *Spalding & Son,* 28 Fed.Cl. at 250. Failure to seek review of the contracting officer's decision rendered it final; "once the

decision of the contracting officer becomes final ... the merits of that decision cannot be judicially challenged." *Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1562 (Fed. Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991); *see* 41 U.S.C. § 605(b) (1994) ("The contracting officer's decision on a claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal ... is timely commenced....").

 INSLAW argues that its claims are not legally barred because several of its tort-based claims could not have been brought before the contracting officer, so the statute of limitations could not have expired. INSLAW relies on 41 U.S.C. § 605(a) (1994), which provides, in part: "This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud." Section 605(a), however, also states that "[a]ll claims by a contractor against the Government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." As the Federal Circuit has noted, section 605(a)'s limitation on the ability of agency heads to settle fraud claims applies only to fraud claims made by the Government against a contractor, not *vice versa. See Martin J. Simko Constr., Inc. v. United States,* 852 F.2d 540, 542–44 (1988). INSLAW does not quarrel with the case law establishing that jurisdiction to resolve a government contract claim empowers the cognizant agency board or the court to resolve tort claims related to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994) (the "CDA"). *See Gregory Lumber Co. v. United States,* 9 Cl.Ct. 503, 525–26 (1986) (citing *Burtt v. United States,* 176 Ct.Cl. 310, 314, 1966 WL 8878 (1966)). Since INSLAW's claims of conversion, deprivation, dissemination, and other tortious acts, with regard to the contractual data rights issue, could have been brought to the contracting officer, the applicable statute of limitations bars its claims for legal recovery.[9]

---

9. For purposes of this opinion, the court need not address whether INSLAW's claim based on an unconstitutional taking could have been

brought before the contracting officer. This is because the statute of limitations has run on any claim to perfect its rights in the property, *i.e.,* its

■ Finally, Modification 12 states that "under no circumstances shall the Government permit dissemination of [the] software beyond these designated offices [the EOUSA and the United States Attorneys' Offices], pending resolution of the issues extant between the Contractor and the Government." Modification 12 describes the issues as "the data rights in enhancements to VAX computer software being used to run U.S. Attorney[s'] PROMIS." Modification 12 does not supply a definition for the term "resolution." [10] From this INSLAW would infer a free-floating limitations event that never occurred, since the Government and INSLAW never resolved the issues between them. This construction would lead to an absurd result: A limitations period could never attach as long as one party deemed that both parties—in contrast to a third-party decision-maker—had not achieved resolution.

The court rules, as a matter of law and for the purposes of any legal claim, that when the contracting officer rendered his final decision regarding INSLAW's contract claim for "proprietary rights to privately financed enhancements," a decision was made that, in effect, resolved the controversy. Moreover, when INSLAW failed to appeal this decision, it became final. *See Seaboard Lumber,* 903 F.2d at 1562. As a legal matter, any claims by INSLAW for conversion, deprivation, dissemination, and other unauthorized acts with regard to PROMIS after the date on which the contracting officer's final decision became unappealable cannot provide a basis for recovery as legal claims. However, in pursuing its equitable claims, INSLAW may present evidence concerning the meaning of the term "resolution" in Modification 12.

Because the Unlimited Rights provisions of the contract were fully applicable, the failure of INSLAW to reach a beneficial "resolution" of the contractual data rights issue, within the terms of Modification 12—informally, through the contracting officer, or by means of agency adjudication or a judicial proceeding—rendered no longer operative, for purposes of a legal claim, any limitations on the Government's rights in the software contemplated in Modification 12. As the succeeding section of this opinion elaborates, this congressional reference will explore at trial whether DOJ impeded, frustrated, or refused to respond unjustifiably or in bad faith to INSLAW's efforts to resolve the issue of its rights to any enhancements. INSLAW has leveled substantial allegations in this regard, but cannot avoid the fact that it forfeited agency or judicial review under the CDA of the contracting officer's final decision denying its claims with regard to the contractual data rights issue.

## 7. *INSLAW's equitable claims*

■ The absence of a legal right to recovery does not foreclose INSLAW's right to a claim under a theory of equitable relief. A right to equitable relief " 'must rest on some unjustified governmental act that caused damage to the claimants.' " *California Canners,* 9 Cl.Ct. at 785 (review panel) (quoting *Wong,* Cong.Ref. No. 3–74, slip op. at 12–13). "[W]hile equitable claims, like legal claims, may be founded on the Constitution, a statute, a regulation, or a common law principle, such bases are not absolutely necessary to warrant relief in equity." *Spalding & Son, Inc. v. United States,* 24 Cl.Ct. 112, 132 (1991), *rev'd on other grounds,* 28 Fed.Cl. 242

---

rights under Modification 12, that INSLAW could have pursued. INSLAW alleges that the Government fraudulently concealed its acts amounting to a taking, so that the 6-year limitations period of 28 U.S.C. § 2501 (1994), would not commence until INSLAW discovered the fraud. However, the Government is not liable in law for a taking, even if fraudulent, that is not based on a property right.

10. The term is not susceptible to a construction based on clear, unambiguous language. The parties' disputed factual findings are suggestive that Modification 12 was intended as an interim solution to facilitate delivery under the contract,

thereby giving DOJ its software, albeit an ostensibly enhanced version, and assuring INSLAW that, provided it could establish proprietary enhancements, the software would not be distributed beyond the EOUSA and specified U.S. Attorneys' Offices. Once the existence of contractual data rights was "resolved," DOJ would either delete the enhancements, if any, or negotiate for their further use. With the benefit of hindsight, one can readily appreciate that the contract language was inadequate to the task of defining the parties' rights and responsibilities with respect to the process of "resolution," let alone a binding time frame therefor.

(1993) (congressional reference). In ascertaining whether INSLAW suffered a wrong, the first step is to determine if INSLAW possessed some right or interest that could have been damaged by the Government's alleged wrongful actions.

In this manner an understanding of INSLAW's legal rights helps inform the court on whether the Government's alleged actions actually damaged INSLAW sufficiently to justify equitable relief.[11] *See, e.g., Kochendorfer v. United States,* 193 Ct.Cl. 1045, 1056, 1970 WL 6465 (1970) ("To ascertain the proper standard for fixing liability ... it is helpful to take account of the general principles governing the particular area of law bearing on the claim").

The court's rulings on INSLAW's legal claims and interests bear on its final determination of any right to equitable recovery. This is because INSLAW could have been harmed, by any allegedly wrongful acts by the Government, only if INSLAW possessed some legal right or interest that could be subject to harm. If, with respect to a particular issue, INSLAW, as a consequence of the substantive law, possessed no cognizable legal right or interest, no amount of nefarious or malicious acts by the Government could justify equitable recovery. To be damaged a party must hold or own something that can be damaged. Consequently, as this matter moves ahead to trial, INSLAW should keep

in mind that the court's rulings—on Clause 74, the scope of Modification 12, and the legal effect of the contracting officer's final decision—will influence the analysis of INSLAW's right to recover based on equitable considerations.

Finally, INSLAW has taken exception to defendant's use of legal contract-based defenses to its claims for recovery. It is beyond debate that claims for equitable relief are influenced by legal rights and interests, for the reasons noted above. Defendant's reliance on contract-based defenses is proper and will receive due consideration, because such defenses help define the extent of INSLAW's legal rights and interests. If defendant can show that, under the contract, INSLAW did not possess a particular right or interest that the Government allegedly infringed, no basis for equitable recovery will exist, regardless of the theory put forth by INSLAW to justify relief.[12]

## CONCLUSION

Accordingly, based on the foregoing,

IT IS ORDERED, as follows:

Defendant's motion *in limine* is granted insofar as the issues for trial are narrowed. Defendant's motion for partial summary judgment is granted only to the extent that the court has given parameters to Clause 74 and Modification 12 and ruled on their rela-

---

11. On October 31, 1995, the court denied defendant's October 3, 1995 Motion for a Scheduling Order by which defendant sought to bifurcate this action to determine, as a preliminary issue, the extent of the Government's contractual rights in the PROMIS system. As a result discovery has proceeded on all issues, and trial also will address all triable issues. This opinion should not be viewed as a consideration of defendant's prior motion by other means. In this opinion the court has attempted to construe the contractual language to provide both parties with an understanding of the extent of their legal rights and interests in order to enable them to focus on the issues and evidence that will be crucial at trial. The court has not determined the proprietary rights issue and has not concluded, for the purposes of equitable relief, that the contract's terms bar recovery. It has simply resolved several purely legal issues and set forth the nature of the evidentiary showing that INSLAW must make to recover on the contractual data rights issue.

12. For example, INSLAW alleges that DOJ personnel and others obtained use of enhanced PROMIS by trickery and other wrongful practices. INSLAW may have forfeited its legal rights to challenge such conduct by failing to pursue available administrative or judicial remedies. However, this congressional reference can consider such an allegation in the context of equitable relief. Taking the analysis one step further, should INSLAW fail to establish that it possessed the right to enhanced PROMIS (or that PROMIS had no proprietary enhancements), given the parties' contract, including Clause 74 and Modification 12, the Government could not be cited for wrongful appropriation of INSLAW's proprietary interests. Government wrongdoing nonetheless would have occurred if INSLAW can establish that DOJ officials frustrated, interfered with, or prevented INSLAW's exercise of its rights under Modification 12 to present to the EOUSA evidence that the claimed enhancements were privately funded.

tionship to INSLAW's legal and equitable claims. INSLAW may present evidence consistent with the body of this opinion as to 1) whether the "N/A" notations in Clause 74 have some significance other than their obvious implication, 2) whether Modification 12 applies to the PRIME version of PROMIS, and 3) what the parties intended the term "resolution" in Modification 12 to mean.